## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN WIND              )
ENERGY ASSOCIATION         )
                           )
Petitioner                 )
                           )          CASE NO. <u>20-1499</u>
v.                         )
                           )
                           )
FEDERAL ENERGY REGULATORY  )
COMMISSION,                )
                           )
Respondent.                )

## PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b),

Rule 15(a) of the Federal Rules of Appellate Procedure and Circuit Rule 15, the

American Wind Energy Association (AWEA) petitions for review of the following

orders issued by the Federal Energy Regulatory Commission, Respondent:

1. <u>Midcontinent Independent System Operator, Inc</u>., Docket Nos. ER20-359-002, et al., Order Accepting Tariff Revisions, 171 FERC ¶ 61,075 (April 27, 2020); and

2. <u>Midcontinent Independent System Operator, Inc</u>., Docket Nos. ER20-359-003, et al., Order Addressing Arguments Raised On Rehearing, 173 FERC ¶ 61,037 (October 15, 2020).

Copies of the orders are attached to this filing as Attachment A.  In the October 15,

2020 order, the Commission rejected the arguments contained in AWEA's Request

1

for Rehearing and affirmed the findings of the April 27, 2020 order. AWEA is thereby aggrieved by the Commission's actions therein.

Respectfully submitted,

AMERICAN WIND ENERGY ASSOCIATION

/s/ Gene Grace
Gene Grace
General Counsel
Gabe Tabak
Counsel
American Wind Energy Association
1501 M Street NW, Suite 1000
Washington DC 20005
Telephone: (202) 383-2529
Facsimile: (202) 383-2505
ggrace@awea.org
gtabak@awea.org

*Counsel for Petitioner*

Dated:      December 14, 2020
            Washington, DC

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| AMERICAN WIND<br>ENERGY ASSOCIATION | ) <br> ) <br> ) | |
| Petitioner | ) <br> ) | CASE NO. <u>20-1499</u> |
| v. | ) <br> ) <br> ) | |
| FEDERAL ENERGY REGULATORY<br>COMMISSION, | ) <br> ) <br> ) | |
| Respondent. | ) | |

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the American Wind Energy Association makes the following disclosures:

1. Petitioner American Wind Energy Association ("AWEA") is a non-profit 501(c)(6) organization organized under the laws of the state of Michigan.

2. AWEA is a national non-profit trade association representing over 1,000 member companies with a common interest in encouraging the deployment and expansion of wind energy resources in the United States, including project developers, project owners and operators, financiers, utilities, marketers and customers.

1

3. AWEA is a non-profit corporation and, as such, no entity has any ownership interest in it. AWEA does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

Respectfully submitted,

AMERICAN WIND ENERGY ASSOCIATION

/s/ Gene Grace
Gene Grace
General Counsel
Gabe Tabak
Counsel
American Wind Energy Association
1501 M Street NW, Suite 1000
Washington DC 20005
Telephone: (202) 383-2529
Facsimile: (202) 383-2505
ggrace@awea.org
gtabak@awea.org

*Counsel for Petitioner*

Dated:        December 14, 2020
             Washington, DC

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 14, 2020, I served a copy of the foregoing document in accordance with the Federal Rules of Appellate Procedure and the Circuit Rules upon the Solicitor of the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426 and the Secretary of the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426 and by U.S. Mail to the parties listed below.

Respectfully submitted,
<u>/s/ Gene Grace</u>

| Party | Served On |
|---|---|
| Alliant Energy Corporate Services, Inc. | Cortlandt Choate<br>4902 N. Biltmore Lane<br>Madison, Wisconsin 53718<br><br>Angela M Cavallucci<br>801 Pennsylvania Ave NW<br>Washington, DC 20004 |
| Ameren Illinois Company | Christopher Jones<br>Troutman Sanders LLP<br>401 9th Street NW<br>Washington, DC 20004 |

| Party | Served On |
|---|---|
| Ameren Services Company | Christopher Jones<br>Troutman Sanders LLP<br>401 9th Street NW<br>Washington, DC 20004<br><br>Joseph Power<br>Ameren Services Company<br>1331 Pennsylvania Ave, NW<br>Suite 512N<br>Washington, DC 20004<br><br>Denice Simpson<br>Ameren Corporation<br>1331 Pennsylvania Ave, NW<br>Suite 550 South<br>Washington, DC 20004 |
| Ameren Transmission Company of Illinois | Christopher Jones<br>Troutman Sanders LLP<br>401 9th Street NW<br>Washington, DC 20004 |
| American Electric Power Service Corporation | Amanda Conner<br>Raja Sundararajan<br>Takis Laios<br>American Electric Power Service Corporation<br>801 Pennsylvania Ave NW<br>Suite 320<br>Washington, DC 20004 |

| Party | Served On |
|---|---|
| American Municipal Power, Inc. | Lisa McAlister<br>Christopher J. Norton<br>Gerit F. Hull<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OH 43229 |
| American Transmission Company LLC | Trevor Stiles<br>Val Lehner<br>Christopher Zibart<br>American Transmission Company LLC<br>PO Box 47<br>Waukesha, WI 53187 |
| Bishop Hill Interconnection LLC | William Hollaway<br>Janine Durand<br>Chelsea Gunter<br>Gibson Dunn & Crutcher<br>1050 Connecticut Ave. NW<br>Washington, DC 20036 |
| Clean Grid Alliance | Rhonda Peters<br>Clean Grid Alliance<br>570 Asbury St., Suite 201<br>St. Paul, MN 55104 |
| Consolidated Edison Company of New York, Inc. | Susan LoFrumento<br>Associate Counsel<br>Consolidated Edison Company of New York, Inc.<br>4 Irving Place<br>New York, NY 10003 |

| Party | Served On |
|-------|-----------|
| Consumers Energy Company | Deborah Moss<br>Consumers Energy Company<br>1730 Rhode Island Ave., N.W.<br>Suite 1007<br>Washington, DC 20036 |
| Cooperative Energy | Matthew Rudolphi<br>Joshua Adrian<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW, Suite 700<br>Washington, DC 20006 |
| Entergy Arkansas, Inc. | Roger Smith<br>Andrea J. Weinstein<br>Entergy Services, Inc.<br>101 Constitution Avenue, NW<br>Suite 200 East<br>Washington, DC 20001 |
| Entergy Louisiana, LLC | Roger Smith<br>Andrea J. Weinstein<br>Entergy Services, Inc.<br>101 Constitution Avenue, NW<br>Suite 200 East<br>Washington, DC 20001 |
| Entergy Mississippi, Inc. | Roger Smith<br>Andrea J. Weinstein<br>Entergy Services, Inc.<br>101 Constitution Avenue, NW<br>Suite 200 East<br>Washington, DC 20001 |

| Party | Served On |
|---|---|
| Entergy New Orleans, Inc. | Roger Smith<br>Andrea J. Weinstein<br>Entergy Services, Inc.<br>101 Constitution Avenue, NW<br>Suite 200 East<br>Washington, DC 20001 |
| Entergy Services, Inc. | Roger Smith<br>Andrea J. Weinstein<br>Entergy Services, Inc.<br>101 Constitution Avenue, NW<br>Suite 200 East<br>Washington, DC 20001 |
| Entergy Texas, Inc. | Roger Smith<br>Andrea J. Weinstein<br>Entergy Services, Inc.<br>101 Constitution Avenue, NW<br>Suite 200 East<br>Washington, DC 20001 |
| International Transmission Company | Amy Monopoli<br>ITC Holdings Corp.<br>27175 Energy Way<br>Novi, MI 48377 |
| Midcontinent Independent System Operator, Inc. | Adriana Rodriguez<br>Kandi Hahn<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Dr.<br>Carmel, IN 46032 |

| Party | Served On |
|---|---|
| MISO Transmission Owners | Wendy Reed<br>Wendy Warren<br>Jeffrey Robin<br>Wright & Talisman, PC<br>1200 G Street NW<br>Suite 600<br>Washington, DC 20005 |
| New York Power Authority | Glenn Haake<br>New York Power Authority<br>30 South Pearl Street<br>Albany, NY 12207<br><br>Andrew Neuman<br>New York Power Authority<br>123 Main Street<br>White Plains, NY 10601 |
| New York State Electric & Gas Corporation | Justin Atkins<br>Avangrid Renewables, LLC<br>1125 NW Couch St. Suite 700<br>Portland, OR 92709 |
| New York Transmission Owners | Lyle Larson<br>Abby Fox<br>Balch & Bingham LLP<br>1901 Sixth Ave., North<br>Birmingham, AL 35203<br><br>David N. Duhe<br>Balch & Bingham LLP<br>1310 Twenty Firth Avenue<br>Gulfport, MS 39501 |

| Party | Served On |
|---|---|
| Niagara Mohawk d/b/a/ National Grid | David Lodemore<br>Senior Counsel, National Grid<br>National Grid USA<br>40 Sylvan Road<br>Waltham, MA 02451 |
| Orange and Rockland Utilities, Inc. | Susan LoFrumento<br>Consolidated Edison Company of New York, Inc.<br>4 Irving Place<br>New York, NY 10003 |
| Otter Tail Corporation d/b/a Otter Tail Power Company | Stacie M. Hebert<br>Otter Tail Power Company<br>215 South Cascade Street<br>Fergus Falls, MN 56537 |
| PPL Electric Utilities Corporation | Steven Nadel<br>PPL Services Corporation<br>2 North 9th St<br>Allentown, PA 18101 |
| Public Service Electric and Gas Company | Sheree Kelly<br>Robert E. Gardinor<br>PSEG Services Corporation<br>80 Park Plaza, T5G<br>Newark, NJ 07102 |
| Rochester Gas and Electric Corporation | Justin Atkins<br>Avangrid Renewables, LLC<br>1125 NW Couch St. Suite 700<br>Portland, OR 92709 |
| RWE Renewables Americas, LLC | Bruce Grabow<br>Locke Lord LLP<br>701 8th Street N.W., Suite 700<br>Washington, DC 20001 |

| Party | Served On |
|---|---|
| Savion Energy, Inc. | Bruce Grabow<br>Locke Lord LLP<br>701 8th Street N.W., Suite 700<br>Washington, DC 20001 |
| Tenaska Inc. | Drew Fossum<br>Tenaska Marketing Ventures<br>11718 Nicholas Street<br>Omaha, NE 68154 |
| Wisconsin Power and Light Company | Cortlandt Choate<br>Mitchell Myhre<br>4902 N. Biltmore Lane<br>Madison, WI 53718 |

# ATTACHMENT A – FERC ORDERS

171 FERC ¶ 61,075
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
Richard Glick, Bernard L. McNamee,
and James P. Danly.

Midcontinent Independent System Operator, Inc.          Docket No. ER20-359-002

ORDER ACCEPTING TARIFF REVISIONS

(Issued April 27, 2020)

1.      On November 12, 2019, as amended on November 14, 2019 and January 21, 2020, pursuant to section 205 of the Federal Power Act (FPA)[1] and Part 35 of the Commission's regulations,[2] Midcontinent Independent System Operator, Inc. (MISO) submitted proposed revisions to Attachment X of its Open Access Transmission, Energy and Operating Reserve Markets Tariff (Tariff) to implement a new *pro forma* Facilities Service Agreement (FSA).  In this order, we accept the proposed Tariff revisions, to be effective as of the date of this order, as requested, as further discussed below.

## I.      Background

2.      MISO's *pro forma* Generator Interconnection Agreement (GIA) in Attachment X of the Tariff describes the schedule for construction, the details of design, and the payment options for any network upgrades constructed for the interconnection customer by the transmission owner with which it directly interconnects.  In MISO, an interconnection customer is responsible for 100% of network upgrade costs, with a possible 10% reimbursement for network upgrades that are 345 kV and above.  The Tariff provides two options for funding the costs of network upgrades for generator interconnections.[3]  Under the first option, the interconnection customer provides up-front

---

[1] 16 U.S.C. § 824d (2018).

[2] 18 C.F.R. pt. 35 (2019).

[3] Prior to March 22, 2011, the Tariff contained another funding option, deemed "Option 1" funding, where:  (1) the interconnection customer provided up-front funding for network upgrades; (2) the transmission owner provided a 100% refund of the cost of network upgrades to the interconnection customer upon completion of the network upgrades; and (3) the transmission owner assessed the interconnection customer a monthly network upgrade charge to recover the cost of the non-reimbursable portion of

funding for network upgrades and the transmission owner refunds the reimbursable portion[4] of the payment, as applicable, to the interconnection customer in the form of a credit to reduce the transmission service charges incurred by the transmission customer with no further financial obligations on the interconnection customer for the cost of network upgrades (the "Generator Up-Front Funding" option).[5]  Under the second option contained in Article 11.3 of MISO's *pro forma* GIA, the transmission owner can unilaterally elect to provide the up-front funding for the capital cost of the network upgrades and assign the non-reimbursable portion of the costs of the network upgrades directly to the interconnection customer through a network upgrade charge that recovers a return on and of the transmission owner's cost of capital (the "Transmission Owner Initial Funding" option).  The details for repayment of the cost of network upgrades through the network upgrade charge are memorialized in an FSA, which to date has been a contract negotiated between the parties and individually filed at the Commission.

3.     In addition to MISO's *pro forma* GIA, the Commission has also accepted a *pro forma* Facilities Construction Agreement (FCA) and *pro forma* Multi-Party Facilities Construction Agreement (MPFCA) for use in the MISO region.[6]  The *pro forma* FCA is an agreement for network upgrades on affected systems, i.e., network upgrades constructed for an interconnection customer by a transmission owner other than the transmission owner with which the interconnection customer directly interconnects.  The *pro forma* MPFCA is used when multiple interconnection requests cause the need for construction of common network upgrades (network upgrades that are constructed by a transmission owner for more than one interconnection customer) on a directly-connected transmission system or an affected system.  The *pro forma* FCA and the *pro forma* MPFCA did not originally include the Transmission Owner Initial Funding option that was contained in Article 11.3 of MISO's *pro forma* GIA.

4.     On June 18, 2015, the Commission granted in part a complaint filed by Otter Tail Power Company, finding that MISO's Tariff was unjust and unreasonable because it did

---

the network upgrade costs.  The Commission found Option 1 funding to be unjust and unreasonable and ordered MISO to remove this funding option from its Tariff.  *See E.ON Climate & Renewables North America, LLC v. Midwest Indep. Transmission Sys. Operator, Inc.*, 137 FERC ¶ 61,076, at P 43 (2011) (*E.ON*), *order on reh'g*, 142 FERC ¶ 61,048, at P 39 (2013), *order on reh'g*, 151 FERC ¶ 61,264 (2015).

    [4] The reimbursable portion would be 10% of the cost of network upgrades 345 kV and above and zero percent of the cost of network upgrades less than 345 kV.

    [5] *E.ON*, 137 FERC ¶ 61,076 at P 43, *order on reh'g*, 142 FERC ¶ 61,048 at P 39.

    [6] *Midwest Indep. Transmission Sys. Operator, Inc.*, 129 FERC ¶ 61,301, at P 5 (2009).

not provide the same network upgrade funding options to all interconnection customers whether in a GIA, FCA, or MPFCA.[7]  The Commission found that the interconnection customers—not the transmission owners—should be allowed to select the financing mechanism; thus, the Commission determined that Article 11.3 of the *pro forma* GIA may be unjust, unreasonable, and unduly discriminatory and directed MISO to make a compliance filing revising its *pro forma* GIA, *pro forma* FCA, and *pro forma* MPFCA to provide that the transmission owner or affected system operator may elect the Transmission Owner Initial Funding option to fund network upgrades only upon the mutual agreement of the interconnection customer.[8]

5.      On appeal, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacated and remanded the Commission's orders.[9]  In its order on remand, the Commission reversed its earlier findings and directed MISO to file Tariff sheets that (1) restore the right of the transmission owner to unilaterally elect the Transmission Owner Initial Funding option for the capital cost of the network upgrades under Article 11.3 of the *pro forma* GIA, and (2) allow the affected system operator under the *pro forma* FCA and the affected system operator or transmission owner under the *pro forma* MPFCA to unilaterally elect the Transmission Owner Initial Funding option for the capital cost of network upgrades.[10]  The Commission subsequently denied rehearing of the Ameren Remand Order and accepted MISO's compliance filing restoring Transmission Owner Initial Funding to the *pro forma* GIA and extending Transmission Owner Initial Funding to the *pro forma* FCA, and MPFCA, effective prospectively as of August 31, 2018.[11]

## II.    <u>Filing</u>

6.      In its November 12, 2019 filing (Filing), MISO explains that the proposed *pro forma* FSA will provide a standard agreement for use when a transmission owner or affected system operator elects Transmission Owner Initial Funding; i.e., elects to

---

[7] *Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220, at P 47 (2015).

[8] *Id.* PP 48-49; *Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc.*, 153 FERC ¶ 61,352, at P 65 (2015).

[9] *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 585 (D.C. Circuit 2018) (*Ameren*).

[10] *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158, at PP 33-34 (2018) (Ameren Remand Order).

[11] *Midcontinent Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,233, at PP 37, 150 (2019) (Ameren Compliance Order).

provide up-front funding for network upgrades.[12]  Specifically, the *pro forma* FSA will provide for the interconnection customer to compensate the transmission owner for a return on and of the capital the transmission owner has invested through its initial funding of network upgrades that are required for the interconnection customer to receive interconnection service.[13]  MISO also states that it proposes revisions to Attachment X of its Tariff and the *pro forma* GIA that are necessary to reflect the addition of, and to effectuate certain provisions of, the proposed *pro forma* FSA.  MISO asserts that it developed the proposal using the feedback of its stakeholders over the course of five stakeholder meetings between May and September of 2019.[14]

7.      In the *pro forma* FSA, MISO proposes the following key provisions:  security in the amount of the network upgrade(s) initial capital cost, which may be reduced *pro rata* over the term of the FSA; a monthly network upgrade charge calculated through a formula rate that is based on the FSA's term and the transmission owner's Attachment O formula rate using data from the previous calendar year; a 20-year default term, unless parties mutually agree to a different term; and breach, default, and cross-default provisions with MISO's *pro forma* GIA.  These provisions are discussed further below.

## III.    **Notices and Responsive Pleadings**

8.      Notice of the Filing was published in the *Federal Register*, 84 Fed. Reg. 63,868 (2019), with interventions and protests due on or before December 3, 2019.  Notice of the Amended Filing was published in the *Federal Register*, 84 Fed. Reg. 64,313 (2019), with interventions and protests due on or before December 5, 2019.  Timely motions to intervene were filed by:  American Transmission Company LLC; Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Long Island Lighting Company, Long Island Power Authority, New York Power Authority, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation (collectively, the New York Transmission Owners); Consumers Energy Company; Cooperative Energy; Entergy Services, LLC, on behalf of Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, and Entergy Texas, Inc. (collectively the Entergy Operating Companies); International Transmission Company, Michigan Electric Transmission Company, LLC, and ITC Midwest LLC (collectively, ITC Companies); Otter Tail Power Company; PPL Electric Utilities Corporation; Public Service Electric and Gas Company; and Wisconsin Power and Light Company.

---

[12] Filing, Transmittal Letter at 4.

[13] *Id.* at 6.

[14] *Id.* at 4.

9.      Timely motions to intervene and comments were filed by the American Wind
Energy Association, Clean Grid Alliance, and the Solar Council (collectively, the Clean
Energy Entities) and MISO Transmission Owners.[15]  Timely motions to intervene and
protests were filed by RWE Renewables Americas, LLC and Savion Energy, Inc.
(collectively, MISO Generation Developers) and Tenaska Inc.

10.     Out-of-time motions to intervene were filed by American Municipal Power, Inc.
and Bishop Hill Interconnection, LLC.

11.     On December 20, 2019, MISO Transmission Owners submitted an answer to the
comments and protests.  On January 21, 2020, MISO submitted an answer to the
comments and protests.

12.     On December 20, 2019, Commission staff issued a letter informing MISO that its
filing was deficient and requesting additional information (Deficiency Letter).  MISO
submitted its response on January 21, 2020 (Deficiency Response).  Notice of the
Deficiency Response was published in the *Federal Register*, 85 Fed. Reg. 4963 (2020),
with interventions and protests due on or before February 11, 2020.  Clean Energy
Entities submitted comments on the Deficiency Response.  Tenaska submitted comments
on the Deficiency Response and an answer to the answers of MISO and MISO

---

[15] MISO Transmission Owners for this filing consist of:  Ameren Services
Company, as agent for Union Electric Company, Ameren Illinois Company, and Ameren
Transmission Company of Illinois; American Transmission Company LLC; Big Rivers
Electric Corporation; Central Minnesota Municipal Power Agency; City Water, Light &
Power (Springfield, IL); Cleco Power LLC; Cooperative Energy; Dairyland Power
Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; East
Texas Electric Cooperative; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy
Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Great River Energy;
Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency;
Indianapolis Power & Light Company; ITC Companies; Lafayette Utilities System;
MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water,
L&P); Missouri River Energy Services; Montana-Dakota Utilities Co.; Northern Indiana
Public Service Company LLC; Northern States Power Company, a Minnesota
corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries
of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power
Company; Prairie Power Inc.; Southern Illinois Power Cooperative; Southern Indiana
Gas & Electric Company; Southern Minnesota Municipal Power Agency; Wabash Valley
Power Association, Inc.; and Wolverine Power Supply Cooperative, Inc.

Transmission Owners.  MISO Transmission Owners filed an answer to the comments on the Deficiency Response and Tenaska's answer.

## IV.    Discussion

### A.    Procedural Matters

13.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2019), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

14.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d) (2019), the Commission will grant the late-filed motions to intervene filed by Bishop Hill Interconnection, LLC and American Municipal Power, Inc. given their interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

15.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2019), prohibits an answer to a protest and/or answer unless otherwise ordered by the decisional authority.  We will accept the answers because they have provided information that assisted us in our decision-making process.

### B.    Substantive Matters

16.    We find the *pro forma* FSA to be just and reasonable, and not unduly discriminatory or preferential and we therefore accept it, to be effective on the date of this order, as further discussed below.

#### 1.    Justification for the *Pro Forma* FSA

##### a.    Filing

17.    MISO contends that the proposed *pro forma* FSA and related Tariff provisions are just and reasonable for several reasons.  MISO asserts that the proposed Tariff revisions respond to the D.C. Circuit's ruling in *Ameren* that transmission owners have the right to earn a return on the network upgrades.[16]  MISO states that the *pro forma* FSA will standardize these agreements across MISO for transmission owners electing Transmission Owner Initial Funding, which will promote efficiency, comparability, predictability, and informed interconnection decisions.[17]  MISO explains that

---

[16] Filing, Transmittal Letter at 10.

[17] *Id.* at 5.

transmission owners will no longer have to negotiate the terms of each FSA separately, and that all parties will know the basic financial arrangement at the start of the interconnection process.  Further, MISO asserts, a *pro forma* FSA will enhance administrative efficiency because conforming FSAs will not need to be filed with the Commission.  MISO asserts that the Commission has consistently recognized the superiority of a *pro forma* agreement over an *ad hoc* approach.[18]

### b.    Protests of the Filing

18.    MISO Generation Developers claim that MISO has failed to provide evidence demonstrating a need for the *pro forma* FSA, as MISO transmission owners have successfully filed many FSAs within the last year.[19]  They state that the Commission has neither issued an order addressing the rehearing request of the Ameren Remand Order nor accepted Tariff revisions reinstating Transmission Owner Initial Funding, and the pleadings in the pending dockets raise serious concerns about the legality of Transmission Owner Initial Funding, the lack of the record to support Transmission Owner Initial Funding, and inconsistencies and incomparability with the processes under MISO's Generator Interconnection Procedures (GIP).[20]  They also take issue with MISO's suggestion that the proposed *pro forma* FSA is needed as part-and-parcel with *Ameren.*[21]  They explain that the Court held that a MISO transmission owner must not be put in a position where it cannot attract capital and thus potentially impede its ability to serve the public, and the Court remanded the case back to the Commission to address the issue and support its prior order.  They contend that the Commission simply reversed course without compiling any evidence to show whether any MISO transmission owner is or has ever been impaired from attracting capital solely because network upgrades are integrated into the transmission grid.

---

[18] *Id.* at 11 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 149 FERC ¶ 61,224, at P 23 (2014), *reh'g denied*, 151 FERC ¶ 61,220 (2015); *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008)).

[19] MISO Generation Developers Protest of the Filing at 1-2.

[20] *Id.* at 2-3.

[21] *Id.* at 3.

### c.    Answers to Protests of the Filing

19.    MISO and MISO Transmission Owners argue that there is demonstrated need for the *pro forma* FSA to effectuate the transmission owners' rights to elect to use Transmission Owner Initial Funding for network upgrades in a consistent, transparent, and non-discriminatory fashion.[22]  They anticipate that many of the transmission owners in MISO will elect to use Transmission Owner Initial Funding for all network upgrades on their systems.  Rather than the current method to individually negotiate FSAs for each relevant network upgrade and between each transmission owner and interconnection customer, MISO and MISO Transmission Owners believe that the *pro forma* FSA will promote efficiency by eliminating the need for each network upgrade's funding and contracting processes to be implemented through individual, one-off negotiations and agreements and provide consistency and transparency by standardizing terms, conditions, and a monthly charge based on a formula rate.

20.    MISO also argues that the instant proceeding is only intended to establish a *pro forma* FSA and does not address the merits of Transmission Owner Initial Funding, which the Commission has approved as just and reasonable.  MISO asserts that some of the protesters' arguments inappropriately attack the Transmission Owner Initial Funding policy and are outside of the scope of the proceeding.[23]  MISO contends that the Commission should dismiss MISO Generation Developers' suggestion that the *pro forma* FSA should be rejected simply due to its association with Transmission Owner Initial Funding.

### d.    Commission Determination

21.    We agree with MISO that the *pro forma* FSA promotes uniformity by standardizing across MISO the agreement to be used when transmission owners elect Transmission Owner Initial Funding.  The availability of a *pro forma* FSA for the implementation of that funding option will help promote administrative efficiency and predictability, as transmission owners and interconnection customers will no longer be required to negotiate the terms and conditions of each FSA.

22.    We reject MISO Generation Developers' claim that MISO has not shown a need for the *pro forma* FSA, because, they argue, the Commission had not yet addressed the rehearing request of the Ameren Remand Order or accepted the GIP revisions implementing Transmission Owner Initial Funding.  A request for rehearing does not stay

---

[22] MISO Answer at 5-6; MISO Transmission Owners Answer at 8-9.

[23] MISO Answer at 12-13.

the effectiveness or enforceability of an order's provisions.[24]  Moreover, the Commission has since denied rehearing of the Ameren Remand Order and accepted Tariff revisions reinstating Transmission Owner Initial Funding.[25]

      **2.**      **Security**

          **a.**      **Filing**

23.    MISO states that the *pro forma* FSA requires the interconnection customer to provide the transmission owner with irrevocable security reasonably acceptable to the transmission owner (for example, a letter of credit, surety bond, or parent guaranty) in the amount equal to the initial capital cost of the network upgrade(s).[26]  MISO explains that this security, which remains in place until the end of the FSA, is intended to replace (and not duplicate) the security provided for the underlying GIA, FCA, or MPFCA.  MISO states that the security provided under a GIA, FCA, or MPFCA may continue or "roll over" under the *pro forma* FSA, if the form and provider of the GIA, FCA, or MPFCA security permit a roll over.[27]  MISO also states that the security may be reduced *pro rata* over the term of the FSA to account for the network upgrade charge amounts that the interconnection customer has paid.  MISO contends that the security will ensure that transmission owners and their transmission customers, including their retail customers, will not be left owning without compensation network upgrades that would not have been required but for the interconnection of a generating facility.[28]  MISO contends that, without security, an interconnection customer may simply stop paying under an FSA and the transmission owner will be forced to operate non-profit appendages to its system, which is contrary to *Ameren*.[29]  MISO acknowledges that the Commission has rejected security requirements in FSAs associated with Option 1 funding for network upgrades, but submits that, contrary to the Commission's assumption in those cases, the security

---

[24] 16 U.S.C. § 825*l*(c) (2018); *Midwest Hydraulics, Inc.*, 120 FERC ¶ 61,247, at P 8 (2007).

[25] *See* Ameren Compliance Order, 169 FERC ¶ 61,233.

[26] Filing, Transmittal Letter at 7.

[27] *Id.* at 14.

[28] *Id.* at 7.

[29] *Id.* at 14 (citing *Ameren*, 880 F.3d 571 at 579).

provided under the GIA, FCA, or MPFCA has been returned or released to the interconnection customer, leaving no security in connection with the FSA.[30]

### b.    Protests of the Filing

24.    Protesters argue that MISO's proposal fails to balance costs and risks for transmission owners and interconnection customers.[31]  They argue that the *pro forma* FSA increases the costs borne by interconnection customers that must pay transmission owners a return on their capital investment in network upgrades without requiring transmission owners to bear the risks associated with that upgrade.  Instead, they contend, interconnection customers are exposed to significant risks associated with the funding and construction of network upgrades, such as the requirement to post security equal to 100% of the costs of network upgrades.  Tenaska claims that the increase of costs and risks to the interconnection customer is inconsistent with *E.ON*, where the Commission found that it was unjust and unreasonable to require an interconnection customer to fund the construction of network upgrades up-front and then permit the transmission owners to repay this amount and charge the interconnection customer for the transmission owner's capital costs and income tax allowance over time.[32]  Tenaska continues that, as in *E.ON*, MISO's proposal allows the transmission owner to avoid many of the risks and costs associated with financing a new construction project while being compensated as if it did incur some of those risks and costs.  Protesters argue that, if the Commission accepts a *pro forma* FSA that disproportionately shifts the risks to interconnection customers, the transmission owners' rate of return should be reduced to reflect the lower risk borne by transmission owners that elect Transmission Owner Initial Funding.[33]

25.    Protesters argue that the transmission owner should not be allowed to collect security under the FSA.  They contend that security is contrary to Commission precedent stating that it is unjust and unreasonable for the interconnection customer to provide

---

[30] *Id.* at 13-14 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 166 FERC ¶ 61,108, at P 14 (2019) (*Bishop Hill*); *Otter Tail Power Co.*, 155 FERC ¶ 61,125, at P 20 (2016) (*Otter Tail*); *Midcontinent Indep. Sys. Operator, Inc.*, 152 FERC ¶ 61,145, at P 39 (2015) (*White Oak I*)).

[31] Clean Energy Entities Comments on the Filing at 3; Tenaska Protest of the Filing at 3.

[32] Tenaska Protest of the Filing at 4 (citing *E.ON*, 137 FERC ¶ 61,076 at P 37).

[33] *Id.* at 4-5; Clean Energy Entities Comments on the Filing at 4.

security in an FSA applying Option 1 funding after network upgrades are in operation.[34] MISO Generation Developers contend that there is no difference between an FSA applying Option 1 funding and an FSA applying Transmission Owner Initial Funding because, in both agreements, after construction of the network upgrades is complete, the transmission owner is entitled to a stream of payments that provide it with a return on and of the cost of the constructed network upgrades.[35]  Tenaska rejects MISO's claim that security is necessary to protect from the risk of under-recovery, as the risk is one that the transmission owner has assumed; under Generator Up-Front Funding, the interconnection customer would provide funds for network upgrades up front.[36]  MISO Generation Developers argue that, if a transmission owner chooses to voluntarily take on the risk of initial funding, then its reward is to collect that investment with a rate of return after commercial operation of the network upgrades.  MISO Generation Developers state that the requirement to provide security is tantamount to the interconnection customer providing the initial funding to support construction of network upgrades.[37]  Tenaska notes that the interconnection process already requires interconnection customers to meet numerous milestones, including significant security milestones, in order to ensure that projects that execute a GIA represent viable projects that can be counted on to meet their financial obligations.[38]  Tenaska further contends that security is unnecessary because, to the extent that a transmission owner is unable to recover its costs from an interconnection customer, a transmission owner could roll the undepreciated portion of the asset into its transmission rates.

### c.   Answers to Protests of the Filing

26.    MISO and MISO Transmission Owners argue that the security provision protects transmission owners and their transmission service customers against the risk of non-payment or default by interconnection customers.[39]  MISO Transmission Owners contend that, without security, if an interconnection customer stops paying under an FSA, the transmission owner's other transmission service customers will have to pay for the

---

[34] MISO Generation Developers Protest of the Filing at 7 (citing *Otter Tail Power Co.*, 154 FERC ¶ 61,072 (2016) (*White Oak*)); Tenaska Protest of the Filing at 6 (citing *Bishop Hill*, 166 FERC ¶ 61,108 at PP 13-14).

[35] MISO Generation Developers Protest of the Filing at 7.

[36] Tenaska Protest of the Filing at 6.

[37] MISO Generation Developers Protest of the Filing at 8.

[38] Tenaska Protest of the Filing at 7.

[39] MISO Answer at 8-9; MISO Transmission Owners Answer at 11-12.

costs of the network upgrades that would not have been required but for the
interconnection customer's project with no revenue stream from the FSA to credit against
those costs, which is contrary to cost responsibility assignments for interconnection
customers' network upgrades under the Tariff.  MISO Transmission Owners refute
protesters' arguments that the security provision is designed to allow a transmission
owner to earn a risk-free return at the expense of interconnection customers, pointing out
that the security is only for the capital invested in network upgrades and not for a return
on that capital.[40]  MISO Transmission Owners also point out that transmission owners
would not keep any security that is collected under an FSA; if it is drawn upon, the
security will be passed through to transmission service customers in the form of revenue
credits to offset the Attachment O Annual Transmission Revenue Requirement.[41]  MISO
stresses that the security provision offers two features to ensure that the *pro forma* FSA
does not unduly burden interconnection customers:  (1) the ability to rollover security
provided under a GIA, FCA, or MPFCA to the FSA at the conclusion of construction;
and (2) the ability to reduce the security under the *pro forma* FSA *pro rata* over the term
of the FSA.

###        d.        Deficiency Letter and Deficiency Response

27.    In the Deficiency Letter, Commission staff asked MISO to provide:  (1)
clarification of the timeline for the interconnection customer to provide the required
security to the transmission owner under the *pro forma* FSA if the security provided
under the GIA, FCA, or MPFCA is not applied as the security for the FSA; and (2) a
description of the criteria that the transmission owner will use to determine at its sole
discretion whether to allow the interconnection customer to terminate security prior to the
expiration of the FSA.[42]

28.    In response to staff's questions, MISO proposes to include language in the
*pro forma* FSA to establish a timeline for the interconnection customer's provision of
security that is consistent with the *pro forma* GIA's requirement for initial payment
within 45 days.[43]  Additionally, MISO proposes language to clarify that the security
requirement cannot lapse between construction and the FSA.  MISO explains that the
transmission owner would be required to release security received for each network
upgrade's costs under the GIA, FCA, or MPFCA upon the transmission owner's receipt
of sufficient replacement security for that network upgrade under the FSA.  MISO also

---

[40] MISO Transmission Owners Answer at 12-13.

[41] *Id.* at 13.

[42] Deficiency Letter at 2.

[43] Deficiency Response at 4.

proposes to eliminate the potential for security to be terminated prior to the expiration of the FSA.[44]  MISO explains that it is too difficult to specify objective criteria for a determination by a transmission owner that security can be terminated early given the multiplicity of forms of credit, payment scenarios, and creditworthiness over time.

### e.    Protests of the Deficiency Response

29.    Tenaska and Clean Energy Entities reiterate that the proposed *pro forma* FSA benefits the transmission owners to the detriment of the interconnection customers and ask the Commission to reject the proposal as unjust and unreasonable.[45]  Clean Energy Entities assert that the Commission should fully scrutinize the relationship between the various categories of proposed security deposits and the appropriate return on and of capital for the transmission owners and should ensure that any such returns are just and reasonable and not unduly discriminatory or preferential.

30.    Tenaska reiterates that the Commission has rejected proposals to require interconnection customers to post security under an FSA after the customer has posted security on the same cost of capital under the GIA,[46] even when it was argued that the security requirement was justified based on the risk of customer default.[47]  Tenaska notes that interconnection customers will incur significant costs in connection with maintaining security for the life of the FSA and these costs would be incurred regardless of whether security rolls over from the GIA or new security is posted under the FSA.[48]  Tenaska and Clean Energy Entities reiterate that the proposed security requirement would insulate transmission owners from the risks associated with constructing and financing network upgrades while allowing them to earn a rate of return specifically designed to compensate them for these risks, which the Commission has previously recognized is unjust and unreasonable.[49]  Tenaska also contends that MISO and MISO Transmission Owners

---

[44] *Id.* at 5.

[45] Clean Energy Entities Comments on the Deficiency Response at 3-4; Tenaska Protest of the Deficiency Response and Answer at 2.

[46] Tenaska Protest of the Deficiency Response and Answer at 4 (citing *Bishop Hill*, 166 FERC ¶ 61,108; *Otter Tail*, 155 FERC ¶ 61,125; *White Oak I*, 152 FERC ¶ 61,145).

[47] *Id.* at 6 (citing *Otter Tail*, 155 FERC ¶ 61,125 at P 20).

[48] *Id.* at 4.

[49] *Id.* at 5 (citing *E.ON*, 137 FERC ¶ 61,076 at P 37); Clean Energy Entities Comments on the Deficiency Response at 2-3.

ignore the fact that any risks are being voluntarily assumed by the transmission owners. In other words, Tenaska states that transmission owners choose to expose themselves to the risk of customer default due to their decision to forego an immediate, up-front recovery of the costs of network upgrades in favor of recovering a return on these costs.[50] Tenaska contends that the security requirement is not the only way to protect other customers against potential costs associated with customer default; the *pro forma* FSA includes default provisions that give the transmission owner the ability to seek to recover its capital costs in the event of customer defaults.[51]  Tenaska argues that, if the Commission does not reject the security provision, it should direct MISO to craft objective criteria that could be used to identify those interconnection customers that do not pose a material risk of default such that the customer should be relieved of its security obligation.[52]

### f.    Answer to Protests of the Deficiency Response

31.    MISO Transmission Owners reiterate that:  (1) the security required under the *pro forma* FSA is only for the capital invested in network upgrades, not for a return on that capital; and (2) any security drawn upon will be passed through to transmission customers.[53]  MISO Transmission Owners contend that protesters' reliance on Commission orders rejecting security in FSAs applying Option 1 funding is unfounded; for instance, the Commission rejected security in *White Oak* because the Tariff in effect did not require security beyond that required under the GIA, and so the interconnection customer had already satisfied the Tariff obligation to post security.[54]  In contrast, MISO Transmission Owners argue, the *pro forma* FSA establishes the Tariff obligation to post security.  Additionally, they contend that security is necessary because transmission owners are required to construct facilities on their transmission systems needed for generator interconnections and have no ability to pick or choose which network upgrades to construct.[55]

---

[50] Tenaska Protest of the Deficiency Response and Answer at 6-7.

[51] *Id.* at 8.

[52] *Id.* at 9.

[53] MISO Transmission Owners Answer to Comments on the Deficiency Response at 3.

[54] *Id.* at 4-5 (citing *White Oak*, 154 FERC ¶ 61,072 at P 14).

[55] *Id.* at 5-6.

## g.    Commission Determination

32.    We find that the proposed security requirement, as revised in the Deficiency Response, is just and reasonable, and accordingly accept it.  We find that the posting of financial security is reasonable to protect the transmission owner and transmission service customers from the risk that an interconnection customer will stop making payments under an FSA and that the portion of the undepreciated costs would be borne by either the transmission owner or transmission service customers, or assigned to another interconnection customer.  We find that this security is not duplicative of the financial security provided under a *pro forma* GIA, FCA, or MPFCA, as the *pro forma* FSA specifies that the interconnection customer will not be required to have security under the GIA/FCA/MPFCA and the FSA at the same time, and that security provided under a GIA, FCA, or MPFCA may roll over to the FSA.

33.    We disagree with protesters' arguments that, largely due to the security requirement, the *pro forma* FSA disproportionately shifts risks associated with constructing and financing network upgrades to the interconnection customer while allowing the transmission owner to earn a risk-free return designed to compensate them for those risks.  We find that the security requirement under the *pro forma* FSA and the return on and of capital provided under Transmission Owner Initial Funding each address a different risk faced by the transmission owner.  The rate of return available to transmission owners when they provide initial funding for network upgrades compensates them for business risk, such as lawsuits, reliability compliance obligations, and environmental and construction risks;[56] in addition, it prevents transmission owners from operating a significant portion of their business on a non-profit basis and ensures that future capital can be attracted.[57]  In contrast, the requirement to post security under the *pro forma* FSA protects transmission owners from the risk that the transmission owner has constructed a network upgrade and an interconnection customer does not make its scheduled payments.  As MISO Transmission Owners note, the security under the *pro forma* FSA is only for the capital invested in network upgrades and not for a return on that capital.

34.    We find the cases cited by protesters, where the Commission rejected security provisions in FSAs implementing Option 1 funding, to be distinguishable.  The Commission in those cases relied on the fact that the Tariff in effect at the time did not contemplate the posting of security under an FSA that implemented Option 1 funding;[58]

---

[56] *See* Ameren Remand Order, 164 FERC ¶ 61,158 at P 31.

[57] *See id.* P 32 (citing *Ameren*, 880 F.3d at 581-82).

[58] *See White Oak*, 154 FERC ¶ 61,072 at P 13; *Otter Tail*, 155 FERC ¶ 61,125 at P 19.

here, MISO is proposing to insert this requirement into the Tariff for use in future FSAs implementing Transmission Owner Initial Funding.

### 3.   Network Upgrade Charge

#### a.   Filing

35.    MISO explains that compensation for the return on and of the transmission owner's investment in the network upgrades subject to the FSA is provided through a monthly network upgrade charge beginning the month following the network upgrade being placed into service and continuing through the default term of 20 years.[59]  MISO asserts that the network upgrade charge is a monthly revenue requirement that is calculated through a formula rate template that will be included in Exhibit I to the FSA. MISO states that the Exhibit I formula multiplies the capital invested in the network upgrades by a levelized fixed charge rate determined from the term of the FSA and data from the transmission owner's Attachment O formula rate, including taxes, interest on long-term debt, and return on equity.  MISO states that, at the beginning of the FSA term, the network upgrade charge will be based on the estimated network upgrade initial capital cost.  A one-time true-up adjustment will be calculated within one year of the in-service date when the actual network upgrade initial capital cost is known.[60]  MISO avers that the network upgrade charge will be re-calculated annually using updated inputs from the transmission owner's previous year's Attachment O formula rate for transmission service.  MISO argues that use of the same inputs as the Commission-approved Attachment O formula rate will provide the same transparency and protocols process that is provided for transmission charges under Attachment O; and, to further enhance transparency, MISO states that transmission owners will include the completed Exhibit I FSA network upgrade charge template as a work paper in the annual information provided to stakeholders in the Attachment O protocols process.  MISO also clarifies that the FSA requires recalculation of the network upgrade charge for any adjustment to the inputs to the Attachment O formula rate for the period to which the adjustment applies and requires refunds or surcharges as necessary.

#### b.   Protests of the Filing

36.    Protesters object to various elements of the proposed network upgrade charge in the *pro forma* FSA.  Protesters first object to the formula rate structure of the proposed network upgrade charge.  MISO Generation Developers also object because the rate will

---

[59] Filing, Transmittal Letter at 6.

[60] *Id.* at 6-7.

vary annually, and they argue that interconnection customers need predictability.[61]
Protesters support the inclusion of a stated rate, which they argue will provide more
certainty and transparency, as well as allow more projects to proceed.[62]  Clean Energy
Entities propose that any *pro forma* FSA should contain an option for the interconnection
customer to choose either a stated rate or formula rate, but if no option is possible, then
only a stated rate should be offered.[63]  Additionally, Clean Energy Entities advance that,
in an MPFCA, each party should be able to individually choose a stated rate or formula
rate structure for its portion of the network upgrade cost.[64]

37.     MISO Generation Developers object to the inclusion of the transmission owner's
combined tax rate, the amount of the transmission owner interest on long-term debt, and
the long-term debt and common equity balances, arguing that MISO did not justify the
inclusion of these items, which only serves to drive up costs.[65]  MISO Generation
Developers argue that the Commission has previously held that Transmission Owner
Initial Funding "does not include the recovery of costs other than the return on and of the
capital costs of network upgrades."[66]  Additionally, MISO Generation Developers assert
that the interconnection customer should not have to pay interest on debt that the
transmission owner raises to enable its election of Transmission Owner Initial Funding.[67]
MISO Generation Developers argue that, under MISO's *pro forma* GIA, a transmission
owner may only collect a tax gross up if there is a taxable event.  They argue that adding
a combined tax rate is contrary to precedent which, at the most, assesses the tax
associated with specific network upgrades at issue, not the whole of a transmission
owner's operations.[68]

38.     MISO Generation Developers contend that the one-time true-up adjustment of the

---

[61] MISO Generation Developers Protest of the Filing at 13.

[62] *Id.*; Clean Energy Entities Comments on the Filing at 8; Tenaska Protest of the
Filing at 9.

[63] Clean Energy Entities Comments on the Filing at 8.

[64] *Id.* at 9.

[65] MISO Generation Developers Protest of the Filing at 11.

[66] *Id.* (citing *Midcontinent Indep. Sys. Operator, Inc.*, 145 FERC ¶ 61,111, at P 41
(2013)).

[67] *Id.* at 12.

[68] *Id.* at 13.

network upgrade charge should occur within six months of the in-service date, rather than one year as MISO has proposed, consistent with MISO's *pro forma* GIA.[69]  Additionally, MISO Generation Developers object to MISO's inclusion of interest on the true-up adjustment, arguing that interest is unwarranted because the interconnection customer is not using the transmission owner's funds in such a way that the time value of money needs to be restored to the transmission owner.[70]  MISO Generation Developers also contend that the proposal provides transmission owners with an incentive to delay the true-up to increase the baseline cost used to set payments.

39.    Tenaska argues that the Commission should direct the transmission owners to give the interconnection customers the option of calculating the network upgrade charge based on accelerated depreciation rather than straight-line depreciation.[71]  Noting that the Commission has required transmission owners to take into account available tax benefits in the calculation of network upgrade charges under an FSA, Tenaska claims that interconnection customers would benefit from accelerated depreciation by front-loading the return of the transmission owner's investment in the associated network upgrades, which (1) lowers the capital costs over the life of the FSA compared to straight-line depreciation and (2) reduces the transmission owner's risks associated with funding network upgrades by recovering their investment faster than spreading out the pay back of the original investment evenly through the term of the agreement.

40.    Tenaska argues that MISO's proposed network upgrade charge does not account for the effect of accumulated deferred income tax (ADIT) in the rate design and, as a result, the transmission owner's investment in network upgrades is overstated for ratemaking purposes.[72]

### c.    Answers to Protests of the Filing

41.    MISO contends that the formula rate calculation in the *pro forma* FSA is consistent with how most other transmission-related formula rates under the Tariff are calculated and thus is just and reasonable.[73]  MISO claims that including a formula rate method for calculating the network upgrade charge fairly balances the equities among transmission customers.  In contrast, MISO notes that stated rates must be offset against

---

[69] *Id.* at 13-14.

[70] *Id.* at 14.

[71] Tenaska Protest of the Filing at 11.

[72] *Id.* at 10.

[73] MISO Answer at 10.

formula rates calculated under Attachment O to the Tariff, and in some years, those stated rates could be significantly out of line with the formula rates.

42.    MISO argues that, contrary to MISO Generation Developers' assertions, the inclusion of the combined tax rate, transmission owner interest on long-term debt, and the long-term debt and common equities balances in the formula rate methodology for calculating the network upgrade charge is consistent with the formula rate framework approved by the Commission.[74]  MISO contends that the framework is designed to address the fact that the transmission owner must pay taxes on income that accrues when the network upgrade charge is collected.  MISO continues that, if there is no allowance for such taxes in the formula rate, then the transmission owner will not actually collect its full return.

43.    Regarding MISO Generation Developers' argument that the one-time true-up of the costs associated with the network upgrade charge should occur six months after the network upgrade is placed in-service, MISO explains that it proposed one year for the true-up in the *pro forma* FSA because there may still be outstanding items even six months after the network upgrade has been placed in-service.[75]  Regarding MISO Generation Developers' objection to interest on the true-up amounts, MISO Transmission Owners state that interest on true-up amounts is a standard feature of the Attachment O annual update and true-up process, and that the interest on the true-up amount can cut in both directions, just as the true-up amounts themselves can.[76]

44.    MISO also argues that Tenaska's request for the Commission to reject MISO's proposed network upgrade charge because, Tenaska argues, it fails to account for the effect of ADIT in the rate design, is inconsistent with Tenaska's statement that the proposed network upgrade charge appears to comply with the Commission's tax normalization policy.[77]  MISO claims that the formula rate methodology for calculating the network upgrade charge set forth in Exhibit I to the proposed *pro forma* FSA properly matches the tax effects of costs and revenues with the recovery of those same costs and revenues, which is the intent of ADIT.  In response to Tenaska's argument that the interconnection customers should have the option of having the network upgrade charge calculated based on accelerated depreciation rather than straight-line depreciation, MISO and MISO Transmission Owners argue that accelerated depreciation in the context of transmission rates is an incentive that must be granted by the Commission and MISO

---

[74] *Id.* at 11.

[75] *Id.* at 12.

[76] MISO Transmission Owners Answer at 24.

[77] MISO Answer at 11-12.

therefore does not have the ability to include accelerated depreciation in the formula rate methodology without first having permission from the Commission.[78]

### d.    Deficiency Letter and Deficiency Response

45.    Staff asked MISO to explain the following aspects of the proposed calculation for the proposed network upgrade charge:  (1) whether the transmission owner's Attachment O data would be updated annually with Attachment O true-up data or Attachment O projected data; (2) the purpose of the deferred recovery adjustment in the calculation of the network upgrade charge; (3) the use of a 16-year Modified Accelerated Cost Recovery System (MACRS) depreciation schedule to calculate the present worth of the tax benefit the transmission owner receives and how the formula in Exhibit I would account for changes to how MACRS could be applied to network upgrade facilities in the future (e.g., revisions to the tax code); and (4) how the effects of ADIT are accounted for.[79]

46.    In response, MISO clarifies several aspects of the proposed calculation of the network upgrade charge.  First, MISO states that only verifiable actual costs will be used in the calculation of the network upgrade charge.[80]  Second, MISO explains that newly-built transmission property under the FSA is treated as 15-year MACRS property for tax depreciation purposes.[81]  MISO also explains that a change to the term or depreciation rates used in MACRS, such as a revision to the tax code, would require amendment of the *pro forma* FSA and its Exhibit I formula rate template as well as the filing of amended FSAs for all projects that use the new tax depreciation rates.  Third, MISO explains that the ADIT amounts are not represented as a separate line item within the Exhibit I formula rate template to the *pro forma* FSA; rather, ADIT amounts are embedded within the Exhibit I formula rate template in Line 36 (Present Worth of State and Federal Tax Benefit) as an offset to plant.  Finally, MISO clarifies that the purpose of the deferred recovery adjustment mechanism is to adjust the annual and/or monthly network upgrade charge to account for any delay between the date when the network upgrade is placed in service and the date when recovery under the FSA begins.  MISO states that the deferred recovery adjustment would only be applied if there is a lag between the network upgrade's in-service date and the Commission's acceptance of the network upgrade charge.  MISO states that the adjustment ensures equivalence on a

---

[78] *Id.* at 12 (citing *Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 (2006)); MISO Transmission Owners Answer at 19.

[79] Deficiency Letter at 1-2.

[80] Deficiency Response at 2.

[81] *Id.* at 3.

present value basis of FSA payments and the rate impact on transmission service customers and does not relate to timeliness of payments or whether payments are annual or monthly.

### e.  Protests of the Deficiency Response

47.  Tenaska disputes MISO Transmission Owners' claim that using accelerated depreciation is not feasible because, they argue, MISO would first need permission from the Commission.[82]  Tenaska states that the Commission has granted the use of accelerated depreciation as an incentive to encourage transmission development because the use of "[a]ccelerated depreciation increases the cash flow of public utilities thereby providing an incentive to undertake transmission investment."[83]  Tenaska suggests that MISO Transmission Owners oppose the use of accelerated depreciation because it would allow interconnection customers to repay the capital cost of network upgrades on an expedited basis and reduce their profits over the life of the agreement.

### f.  Answer to Protests of the Deficiency Response

48.  MISO Transmission Owners claim that the Commission should reject Tenaska's arguments concerning accelerated depreciation as contrary to the FPA.[84]  MISO Transmission Owners reiterate that the FPA forbids public utilities from collecting depreciation expense at accrual rates other than those established by the Commission. They explain that public utilities must apply for, and be granted, Commission authorization to use accelerated depreciation and must demonstrate that there is a nexus between accelerated depreciation as an incentive rate treatment and the transmission project's particular risks and challenges.[85]

### g.  Commission Determination

49.  We find that it is just and reasonable for the transmission owner to recover capital costs for network upgrades through a network upgrade charge established using a formula rate, and therefore accept MISO's proposed network upgrade charge.  The MISO Tariff does not address how Transmission Owner Initial Funding is implemented in the context

---

[82] Tenaska Protest of the Deficiency Response and Answer at 12 (citing MISO Transmission Owners Answer at 19).

[83] *Id.* (citing Order No. 679, 116 FERC ¶ 61,057 at P 146).

[84] MISO Transmission Owners Answer to Comments on the Deficiency Response at 8-9 (citing 16 U.S.C. § 825a).

[85] *Id.* at 9 (citing *Ameren Servs. Co.*, 135 FERC ¶ 61,142, at P 35 (2011)).

of MISO's participant funding for interconnection customer network upgrades.[86]  The Commission has previously approved the use of a formula rate to calculate the network upgrade charge in FSAs implementing the Transmission Owner Initial Funding option, and Exhibit I of the *pro forma* FSA uses a consistent approach to those previously accepted.[87]  We find that use of a formula rate allows transmission owners to recover their return on and of capital invested for interconnection customers' network upgrades. Additionally, because the Attachment O inputs used in the formula rate are updated annually, we find that the formula rate will automatically reflect any future changes, such as those to the return on equity and taxes, prospectively.  While protesters request the use of a stated rate, as they contend it provides more predictability, we find that the formula rate is a just and reasonable method to ensure that transmission owners recover the return on and of capital for constructing interconnection customers' network upgrades; we need not find that it is the most just and reasonable proposal among all possible alternatives.[88]

50.     We disagree with protesters' objections to the inclusion of the combined tax rate, transmission owner interest on long-term debt, and the long-term debt and common equities balances in the formula rate methodology for calculating the network upgrade charge.  The Commission has found that the transmission owner's return on and of capital should not be limited to impermissibly restrict its ability to recover the costs of debt and equity needed to finance the upgrades under Transmission Owner Initial Funding.[89]  The Commission stated that the weighted cost of capital in the transmission owner's Commission-approved rate of return for use in its transmission rate formulas and the income tax allowance is part of the allowance for return on capital to provide the transmission owner with recovery of its capital.  Therefore, the Commission found it reasonable for the transmission owner to use the weighted cost of capital and income tax allowance to recover the return on the capital costs of the network upgrades under the Transmission Owner Initial Funding option.  The Commission also clarified that the rate base to which the rate of return is applied should include net transmission plant in service, adjusted for ADIT and investment tax credits allocable to transmission plant and should not include other elements such as construction work in progress, working capital, land held for further use or allocations of common, general, or intangible plant. Additionally, the Commission clarified that operations and maintenance expenses, general and common depreciation expenses, and taxes other than incomes taxes must be

---

[86] MISO Tariff, Attach. X, app. 6, art. 11.3 (79.0.0); app. 8, art. 3.2.1 (39.0.0); and app. 9, art. 3.2.1 (39.0.0).

[87] *See Midcontinent Indep. Sys. Operator, Inc.*, 154 FERC ¶ 61,187 (2016).

[88] *See PJM Interconnection, L.L.C.*, 147 FERC ¶ 61,103, at P 59 (2014).

[89] *Midcontinent Indep. Sys. Operator, Inc.*, 149 FERC ¶ 61,099, at P 20 (2014).

excluded from the development of the network upgrade charge.[90]  We therefore find that the proposed formula rate complies with the Commission's approved method for cost recovery and that the embedded weighted cost of capital calculations are appropriate in rates used for transmission owners to recover the return on the capital costs of network upgrades under Transmission Owner Initial Funding.

51.     We accept MISO's proposal for a "one-time true-up adjustment to occur within one year of the In-Service Date when the [actual network upgrade cost] is known and all costs associated with the [estimated network upgrade costs] have been accounted for."[91] We accept MISO's explanation that it selected one year for the true-up because there may still be outstanding items even six months after the network upgrade goes in-service.  We note that the *pro forma* FSA states that the true-up will occur at most one year from the in-service date; it does not preclude the true-up from occurring sooner if the actual network upgrade charge is known.  We also find it appropriate to apply interest on the true-up adjustment.  We agree with MISO Transmission Owners that interest on true-up amounts is a standard feature of the Attachment O annual update and true-up process,[92] and we find that MISO has proposed to take a balanced approach by applying interest to both undercharges and overcharges so that the recipient can be made whole for the time value of monies that otherwise would have been available for its use.  We do not agree with the argument that an interconnection customer is not using the transmission owner's funds in such a way that the time value of money needs to be restored to the transmission owner.  Interest on refunds that could be due to the transmission owner when the estimated costs are less than the actual costs of the network upgrade(s) is based on the applicable average prime rate for each calendar quarter published in the Federal Reserve Bulletin, or in the Federal Reserve's "Selected Interest Rates" (Statistical Release H. 15), for the fourth, third, and second months preceding the first month of the calendar quarter.[93]  This arrangement compensates the transmission owner for the forgone opportunity to utilize such the refunded amount during the period that that the network upgrade charge is being trued-up; the interest on refunds is not based on the

---

[90] *Id.* P 21.

[91] Filing, proposed MISO Tariff, Attach. X, app. 14, art. III.g (31.0.0).

[92] *See* MISO Tariff, Attach. O § 2 (MISO Formulaic Rates), § V (Changes to Annual Updates); MISO Tariff, Attach. O § 18 (ITCM Annual Rate Calculation and True-Up Procedures), § VII (Calculation of True-Up Adjustment) (32.0.0); s*ee also Sw. Power Pool, Inc.*, 167 FERC ¶ 61,202, at P 16 n.22 (2019); *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,216, at P 18 (2019).

[93] *See* C.F.R § 35.19a.(iii)(A) (2019).

interconnection customer's use of funds available to it due to an initial lower monthly payment.

52.     We acknowledge MISO's clarification in its deficiency response that only verifiable actual costs will be used in the calculation of the network upgrade charge, which is based on the transmission owners' Attachment O formula rate using data from the previous calendar year.[94]  Specifically, MISO indicates that, if a transmission owner's Attachment O formula rate is based on forward-looking projections, the transmission owner will use its Attachment O true-up data, which is verifiable actual data.  MISO further explains that, if a transmission owner's Attachment O formula rate is based on historical information, the transmission owner will use its prior year historical actual data to update the network upgrade charge.

53.     Similarly, we acknowledge MISO's explanation in its deficiency response that the deferred recovery adjustment is used to adjust the network upgrade charge to account for any delay between the date when the network upgrade is placed in service and the date when recovery under the FSA begins.[95]  We expect that transmission owners will only apply the deferred recovery adjustment in the event that there is a lag between the network upgrade's in-service date and the Commission's acceptance of the network upgrade charge.  As such, the deferred adjustment will only be applied to delays relating to initial payments and not for missed payments, which we note are covered by the security provision.[96]

54.     We accept MISO's proposal that transmission owners will depreciate network upgrade facilities using the MACRS depreciation rate for tax purposes and straight-line depreciation over the term of the FSA for ratemaking purposes.  We disagree with Tenaska's argument that the Commission should direct transmission owners to offer interconnection customers the option to have their network upgrade facilities depreciated using an accelerated method for ratemaking purposes because, Tenaska argues, the Commission has previously granted the use of accelerated depreciation as an incentive to encourage transmission development.  MISO's instant proposal is not an application for a transmission ratemaking incentive under section 219 of the FPA, and Commission orders in that context do not require a particular result here as applied to network upgrade facilities.  As we discuss below, we find the proposal to depreciate network upgrade facilities over the term of the FSA and the proposed 20-year default term to be just and reasonable.

---

[94] Deficiency Response at 2.

[95] *Id.* at 3-4.

[96] Filing, proposed MISO Tariff, Attach. X, app. 14, art. IV.b (31.0.0).

55.    Protesters also make arguments concerning whether MISO's proposed network upgrade charge properly accounts for ADIT.  Under Commission ratemaking policies, income taxes included in rates are determined based on the return on net rate base that is generally calculated using straight-line depreciation of plant values over the useful life of the plant.  Companies that take advantage of accelerated depreciation, such as the MACRS, for tax purposes will typically have lower income taxes payable during the early years of an asset's life followed by corresponding increases in income taxes payable during the later years of an asset's life, as the deductible amount of tax depreciation expense diminishes.  As a result, a company's income taxes owed to taxing authorities during a given period will differ from its income tax expenses reported for ratemaking purposes.  These income tax differences give rise to deferred taxes, which are recorded as ADIT on the company's regulated books and records throughout the duration of the asset's life.  Commission policy requires a company to deduct ADIT balances from its rate base, because balances reflect income tax allowances collected in rates that were in excess of income taxes payable during the early years of asset lives.

56.    We disagree with Tenaska's argument that MISO's proposed network upgrade charge does not account for the effect of ADIT in the rate design and, as a result, the transmission owner's investment in network upgrades will be overstated for ratemaking purposes.  The network upgrade charge template submitted by MISO in the instant filing uses a line item called present worth tax benefit as a proxy for ADIT.  The present worth tax benefit represents the discounted present value of *lower* income taxes payable, by the transmission owner, as a result of using accelerated depreciation (i.e., MACRS) for a given network upgrade asset.  This present worth tax benefit is treated as a "benefit" to the interconnection customer by deducting this value from the initial capital investment made by the transmission owner, resulting in an overall reduced network upgrade charge.  The reduced initial capital investment amount is then grossed-up by the applicable combined tax rate to derive a present worth revenue requirement.[97]  The proposed network upgrade charge formula then converts the present worth revenue requirement into a levelized monthly charge over a 20-year recovery period.  The resulting network upgrade charge fully accounts for the benefits of the timing difference between when the network upgrades are depreciated for tax purposes and when the costs of the network upgrades are recovered over the 20-year term of the FSA.  The levelized annual network upgrade charge will be treated as a revenue credit in Attachment O formula rates over the

---

[97] This method similarly tracks the method prescribed under section 5.17.4 of MISO's *pro forma* GIA for recovery of contributions in aid of construction for transmission owner interconnection facilities and network upgrades, which requires the interconnection customer to pay the initial capital investment net of the present value of future tax deductions for depreciation (i.e., capital investment minus the present value tax benefits) plus a tax gross-up on the net capital investment.

duration of the FSA term, to be offset against the transmission owners' Annual Transmission Revenue Requirement.

57.    We note that, while MISO proposes to recover the cost of network upgrades, net of the present worth tax benefit, from interconnection customers over the term of the FSA, it does not propose to modify the depreciation rates approved for use in the Attachment O formula rates. Accordingly, the depreciation of the network upgrades and the associated accounting for ADIT in accordance with the Commission's policies [98] on the transmission owners' books are expected to continue to reflect recovery over the useful life of the assets within the Attachment O formula rates. The Commission expects full compliance with its tax normalization and ADIT policies and regulations for assets in rate base, regardless of separately negotiated network upgrade charge rates.

### 4.    **Default Term**

#### a.    **Filing**

58.    MISO states that the default term for the *pro forma* FSA is 20 years, although the agreement allows for a different term upon mutual agreement of the parties.[99] MISO contends that this term ensures that payments under the FSA are spread over a long enough time to prevent significant impact on the transmission owner's transmission rates and therefore on its other transmission customers. MISO notes that this default term is consistent with FSAs that were recently accepted by the Commission.[100] MISO argues that establishing a shorter default term could result in unnecessary complications by causing compensation for network upgrade costs paid by different customers to be out of alignment. MISO explains that, if the default term of the FSA is too short, the compensation paid by interconnection customers and credited to transmission owners' other customers' transmission rates could exceed the amount of network upgrade costs in

---

[98] *See* 18 C.F.R. Part 101 (2019); *see also Regulations Implementing Tax Normalization for Certain Items Reflecting Timing Differences in the Recognition of Expenses or Revenues for Ratemaking and Income Tax Purposes*, Order No. 144, FERC Stats. & Regs. ¶ 30,254 (1981) (cross-referenced at 15 FERC ¶ 61,133), *order on reh'g*, Order No. 144-A, FERC Stats. & Regs. ¶ 30,340 (1982) (cross-referenced at 18 FERC ¶ 61,163).

[99] Filing, Transmittal Letter at 6.

[100] *Id.* at 11 (citing *Midcontinent Indep. Sys. Operator, Inc.*, Docket No. ER19-2114-000 (Aug. 8, 2019) (delegated letter order); *Midcontinent Indep. Sys. Operator, Inc.*, Docket No. ER19-2118-000 (Aug. 8, 2019) (delegated letter order); *Midcontinent Indep. Sys. Operator, Inc.*, Docket No. ER19-2119-000 (Aug. 8, 2019) (delegated letter order)).

rates, causing transmission rates to be artificially low during the short term of the FSA
and then to swing back to increased amounts when the FSA ends, potentially causing rate
shock.[101]  Similarly, MISO claims that a single, lump-sum payment would cause even
greater rate shock and accounting difficulties.  MISO contends that a lump-sum payment
would be akin to a contribution in aid of construction and would negate the transmission
owners' right under the Tariff to elect Transmission Owner Initial Funding and thereby
earn a return on and of the costs of network upgrades on their facilities that are needed to
accommodate a generator's interconnection.

### b.    Protests of the Filing

59.    Protesters take issue with the proposed 20-year term for the *pro forma* FSA.
Protesters dismiss MISO's argument that a 20-year term will prevent rate shock in
relation to Attachment O revenue requirements; they argue that there is no nexus between
paying for network upgrades under MISO's GIP and Attachment O transmission service
rates.[102]  Specifically, whether the interconnection customer pays up front for network
upgrades or pays after commercial operation, the revenue that the transmission owner
receives is not applied as an offset to the transmission owner's transmission rate base.[103]
Clean Energy Entities claim that MISO's proposal will tie up the interconnection
customer's capital and provide unpredictable payments for two decades to pay for
network upgrades for which the interconnection customers are already financially
responsible.[104]  MISO Generation Developers assert that each project has different
financing situations and revenue streams, and those differences warrant flexibility to
design a term to meet those project-specific needs.[105]  Protesters assert that the
Commission should require MISO to implement different term options to allow greater
flexibility, such as an upfront payment for any rate of return on network upgrades, a
10-year term option, or a blank default term.[106]  Clean Energy Entities note that the
Commission has previously favored generation interconnection provisions that provide

---

[101] *Id.* at 11-12.

[102] Clean Energy Entities Comments on the Filing at 4-5; MISO Generation
Developers Protest of the Filing at 9.

[103] MISO Generation Developers Protest of the Filing at 9.

[104] Clean Energy Entities Comments on the Filing at 5.

[105] MISO Generation Developers Protest of the Filing at 10.

[106] *Id.*; Clean Energy Entities Comments on the Filing at 5.

flexibility for interconnection customers, without altering the minimal risk assumed by the transmission owners and providing a rate of return consistent with that risk profile.[107]

### c.      Answers to Protests of the Filing

60.     MISO highlights that the *pro forma* FSA provides flexibility to the default term by permitting the parties to mutually agree to a different term.[108]  MISO Transmission Owners assert that a default term shorter than the proposed 20 years could result in compensation and accounting for the network upgrades' costs to be out of alignment, resulting in rate shocks.[109]  MISO Transmission Owners aver that a single, upfront lump sum payment may cause an even more severe rate shock and would deprive transmission owners of their right to earn a return on and of their capital investment in the generator-driven network upgrades.

### d.      Commission Determination

61.     We accept MISO's proposed default term of 20 years as just and reasonable because it links the term to the lower end of the average GIA term under which interconnection service is provided.  We find that using the low end of the average GIA term is reasonable because it allows the transmission owner to recover its return on and of capital invested in network upgrades over a time period based on the term over which interconnection service will be provided, while providing the interconnection customer with a shorter period to pay depreciation expenses than the period of recovery based on useful service life generally used in Commission ratemaking.  Additionally, tying the default term to the lower end of the average GIA provides the transmission owner with the ability to recover its capital costs prior to the expiration of the initial interconnection service term from the GIA.

62.     Because we find MISO's proposed default term of 20 years just and reasonable, we do not consider protesters' proposals for alternative default terms (i.e., upfront payment, 10-year term, and blank term).  Additionally, the proposal allows the parties to

---

[107] Clean Energy Entities Comments on the Filing at 5-6 (citing *Reform of Generator Interconnection Procedures and Agreements*, Order No. 845, 163 FERC ¶ 61,043, at P 369 (2018)).

[108] MISO Answer at 7-8.

[109] MISO Transmission Owners Answer at 10-11.

negotiate a different term, and therefore the *pro forma* FSA provides the flexibility for parties to agree to an alternative term through a non-conforming FSA.[110]

63.    Contrary to protesters' claims that the revenue that the transmission owner receives from a network upgrade charge is not applied as an offset to the transmission owner's transmission rate base, we note that MISO's Attachment O formulas already include line items that provide revenues such as those associated with network upgrade charges from an FSA to be treated as a revenue credit to the transmission owners' Annual Transmission Revenue Requirement over the duration of the FSA term in Account 456.1 (Revenues from the Transmission of Electricity for Others) or Account 454 (Rent from Electric Property).  Additionally, MISO and MISO Transmission Owners state that they will include the completed FSA network upgrade charge template as a workpaper in the annual Attachment O informational filing to enhance transparency.[111]

### 5.    Breach, Default, and Cross-Default

#### a.    Filing

64.    MISO states that the *pro forma* FSA contains breach, default, and cross-default provisions.[112]  MISO proposes that, if a breach is declared, the breaching party has 30 calendar days to cure the breach, or 90 days to cure if the breach cannot be cured within 30 calendar days.  MISO proposes that an interconnection customer's breach of the FSA will also be considered a breach of the GIA and will be subject to the terms of proposed Article 17 of the GIA, including cure periods, default, and termination for default.  If a default under a GIA results from the interconnection customer's breach of an FSA and subsequent failure to cure, MISO proposes that the transmission owner and MISO will be entitled to apply all rights and remedies available by reason of default under the FSA and the GIA, including termination of the GIA.  MISO asserts that these provisions protect transmission owners and their other transmission service customers from strategic non-payment of the FSA.  Without such cross-default provisions, MISO argues, an interconnection customer could decide not to pay under the FSA and not to maintain the required security, and there would be little recourse for the transmission owner, particularly if the transmission owner is not directly connected to the interconnection customer and therefore not a party to the interconnection customer's

---

[110] Filing, proposed MISO Tariff, Attach. X, app. 14, art. II (31.0.0).

[111] Filing, Transmittal Letter at 7; MISO Transmission Owners Answer at 5-6.

[112] Filing, Transmittal Letter at 8.

GIA.[113]  MISO asserts that the cross-default provisions provide an incentive for interconnection customers to abide by the FSAs to which they are a party.

### b.    Protests of the Filing

65.    Tenaska argues that the Commission should require modification of the default provisions of the *pro forma* FSA.[114]  First, Tenaska claims that, if an interconnection customer defaults, the transmission owner's remedy should be limited to recovering any undepreciated capital costs associated with the construction of the network upgrades. Tenaska states that MISO has not provided any evidence that it is just and reasonable to require a defaulting interconnection customer to pay all outstanding network upgrade charges in the event of customer default.  Tenaska claims that it would be unjust and unreasonable and inconsistent with Commission precedent to permit a transmission owner to recover a rate of return once it has fully recovered the capital costs associated with the network upgrades.[115]  Second, Tenaska argues that adopting the proposed cross-default provision could potentially result in the arbitrary termination of service under the GIA without appropriate Commission oversight.  For instance, Tenaska states that if an interconnection customer fails to pay an amount in dispute, the *pro forma* FSA would appear to allow a transmission owner to claim that MISO should terminate the interconnection customer's interconnection service if the applicable period for payment had passed.  Tenaska states that, if MISO or a transmission owner believes that termination of interconnection service is warranted, they should be required to make a filing with the Commission seeking approval for termination of the GIA.[116]

### c.    Answers

66.    MISO and MISO Transmission Owners claim that the cross-default provisions protect transmission owners and their other transmission service customers from non-payment and ensures their return on and of the network upgrade costs.[117]  MISO highlights that cross-default provisions provide the interconnection customer with the opportunity to cure any breach before a default may be declared and that no party can

---

[113] *Id.* at 14.

[114] Tenaska Protest of the Filing at 8.

[115] *Id.* (citing *Bishop Hill*, 166 FERC ¶ 61,108 at P 16 (stating that network upgrade charge should not include contribution to portion of plant that has already been depreciated)).

[116] *Id.* at 8-9.

[117] MISO Answer at 9-10; MISO Transmission Owners Answer at 13.

simply terminate interconnection service without Commission oversight because Commission regulations require that a filing be made to the Commission to cancel or terminate a service agreement.[118]

67.    In its answer to MISO's answer, Tenaska argues that MISO has failed to demonstrate that requiring the interconnection customer to pay all outstanding network upgrade payments upon default is just and reasonable.[119]  Tenaska disagrees with MISO's argument that limiting the remedy in the event of default to the amount of the undepreciated capital cost of the network upgrades would thwart the purpose of the FSA; Tenaska claims that MISO overlooks the fact that *Ameren* did not require the Commission to guarantee each transmission owner a particular level of return as a result of its election of Transmission Owner Initial Funding.  Tenaska avers that there is no basis for allowing a transmission owner to earn a return on its capital cost once those capital costs have been fully recovered from the interconnection customer.  Tenaska explains that, if an interconnection customer defaults during year 10 of a 20-year FSA and pays the undepreciated capital costs of the network upgrades at that time, then the transmission owner will have fully recovered its investment and there would be no remaining undepreciated rate base that would warrant earning a return for the remaining term of the FSA.

68.    Tenaska asks the Commission to reject the proposed cross-default provisions of the GIA and FSA.[120]  Tenaska reiterates that the proposed cross-default provisions have the potential to result in the arbitrary termination of service under the GIA.  Tenaska challenges MISO's claim that the opportunity to cure a default will provide adequate protection to interconnection customers because, Tenaska contends, the proposed FSA does not include the same protections afforded to interconnection customers under the GIA.  In particular, Tenaska points out that, under the proposed *pro forma* FSA, a transmission owner could declare an interconnection customer to be in default simply for failing to make a payment that the interconnection customer does not believe to be owed under the agreement, triggering termination of both the FSA and GIA and giving the transmission owner an immediate right to seek payment of all outstanding network upgrade charges.

69.    MISO Transmission Owners disagree with Tenaska's argument that it is unjust and unreasonable to require a defaulting interconnection customer to pay all outstanding network upgrade charges under the FSA in the event of default, because the transmission

---

[118] MISO Answer at 10 (citing 18 C.F.R. § 35.15(a)).

[119] Tenaska Protest of the Deficiency Response and Answer at 10.

[120] *Id.* at 11.

owner has fully recovered the cost of capital invested in network upgrades at that point.[121]
MISO Transmission Owners explain that the transmission owner will not have fully
recovered its capital if an interconnection customer defaults before the FSA term has
expired because the annual charge in the *pro forma* FSA recovers one-twentieth of the
capital invested annually; therefore, it is reasonable to include a portion of the capital
investment in the network upgrades in the outstanding payment obligation due upon
default from an interconnection customer prior to the end of the FSA's term.  In addition,
MISO Transmission Owners reiterate that nothing in the proposed *pro forma* FSA and
GIA default and cross-default provisions can override the requirements of the FPA and
the Commission's regulations for public utilities to file service agreement terminations
with the Commission at least 60 days in advance of the termination date.

### d.    Commission Determination

70.    We find that MISO's proposed breach, default, and cross-default provisions are
just and reasonable.  We agree with MISO that the cross-default provisions appropriately
protect transmission owners from strategic non-payment of the FSA.  Without such
provisions, an interconnection customer could decide not to pay under the FSA (and not
maintain the required security) and still receive interconnection service using the unpaid
network upgrades.

71.    We disagree with protesters that, in the event of a default, the interconnection
customer should only be liable for the undepreciated capital costs of the network
upgrades.  The purpose of the *pro forma* FSA is to allow the full return on and of the
network upgrade costs via an annualized charge, not a fraction thereof.

72.    We also disagree with protesters that the proposed breach, default, and
cross-default provisions may result in arbitrary termination of interconnection service.
The proposal provides the interconnection customer with the opportunity to cure any
breach.  Moreover, MISO's proposal does not override the Commission rules requiring
the filing of any terminated service agreement for Commission review.[122]  As such,
interconnection customers retain the opportunity to protest the termination.

---

[121] MISO Transmission Owners Answer to Comments on the Deficiency Response
at 7.

[122] *See* Order No. 2003-A, 106 FERC ¶ 61,220 at P 201.

### 6.    **Miscellaneous Issues**

#### a.    **Filing**

73.    The proposed *pro forma* FSA in MISO's Filing has a liability provision which states, among other things, that the transmission owner will not be liable to the interconnection customer for damages caused by interruption of service, voltage or frequency variations, single phase to three phase lines, reversal of phase rotation, or carrier-current frequencies imposed by transmission owner for system operations or equipment control except such as result from the failure of transmission owner to exercise good utility practice in furnishing the service.[123]   The proposed *pro forma* FSA states that the interconnection customer should install the proper protective equipment if such occurrences might damage its generating facility.

74.    MISO also proposes a new section 17 (Facilities Service Agreement) to its GIP in Attachment X of its Tariff that requires, if the transmission owner elects to use Transmission Owner Initial Funding, the interconnection customer, transmission owner, and transmission provider to enter into an FSA to memorialize the terms of repayment for network upgrades and transmission owner's system protection facilities.[124]   Section 17 also specifies that the *pro forma* FSA is included as Appendix 14 of Attachment X and that it is subject to the terms and conditions of Attachment X.

75.    MISO also proposes several modifications to its *pro forma* GIA to accommodate the *pro forma* FSA.[125]   First, MISO proposes to revise Article 11.3 of the *pro forma* GIA to require the proposed *pro forma* FSA for the Transmission Owner Initial Funding to go into effect.  MISO states that the revised language specifies that, if a transmission owner elects Transmission Owner Initial funding, the parties will enter into an FSA, which will take the form of the *pro forma* FSA in Appendix 14 of Attachment X of MISO's Tariff.  Second, MISO proposes to add a new Article 17.1.3 to the *pro forma* GIA to address cross-default with the *pro forma* FSA.  Third, MISO proposes to add a new interconnection customer milestone to Appendix B of the *pro forma* GIA to require an FSA when the transmission owner has elected Transmission Owner Initial Funding.  In such an instance, the interconnection customer will enter into an FSA with the transmission owner for the network upgrade associated with the GIA within 90 calendar

---

[123] Filing, proposed MISO Tariff, Attach. X, app. 14 (Facilities Service Agreement), art. X.g (31.0.0).

[124] *Id.*, Transmittal Letter at 10.

[125] *Id.*

days of the effective date of the GIA and before the in-service date of the associated network upgrades.

### b.    Protests of the Filing

76.    Protesters request that the Commission direct MISO to clarify that it will file an unexecuted FSA with the Commission upon the request of an interconnection customer in the event of a disagreement over terms and conditions or, in the alternative, require MISO to file Tariff changes to reflect this requirement.[126]

77.    MISO Generation Developers argue that the liability provision of the *pro forma* FSA is overbroad because it includes items that are not within the scope of the FSA, such as liability for damages caused to equipment and even a customer obligation to install proper protective equipment.[127]  They state that liability should be limited to the subject matter of the FSA, which is the obligation to make payments.

78.    MISO Generation Developers argue that, because MISO proposes the FSA be signed within 90 days of the effective date of the GIA, a provision is needed to ensure that, if the interconnection customer or MISO terminates the GIA before commercial operation is achieved for the generating facility, the FSA likewise will terminate with no liability for any of the payments under the FSA.[128]

79.    Protesters claim that MISO's proposal should include a requirement for a transmission owner to disclose its intent to use Transmission Owner Initial Funding prior to putting cash at risk at or before Decision Point I in the interconnection process.[129] MISO Generation Developers explain that, currently, the interconnection customer is not apprised until the GIA negotiation stage.[130]  Protesters explain that the election of Transmission Owner Initial Funding can increase the costs of network upgrades by up to 60-80% for interconnection customers, and so interconnection customers need to know as soon as possible whether the transmission owner will elect this option so that they can make informed business decisions about whether to remain in the queue before they are

---

[126] Clean Energy Entities Comments on the Filing at 9; MISO Generation Developers Protest of the Filing at 6.

[127] MISO Generation Developers Protest of the Filing at 14.

[128] *Id.* at 15.

[129] *Id.* at 4; Clean Energy Entities Comments on the Filing at 6.

[130] MISO Generation Developers Protest of the Filing at 4.

required to put up potentially forfeitable financial milestones.[131]  Clean Energy Entities also state that, if one transmission owner intends to initially fund a network upgrade, but another suitable solution to a constraint exists with a different transmission owner that does not intend to provide initial funding, MISO must disclose any difference in costs to the interconnection customer.[132]  Clean Energy Entities contend that the Commission favors generator interconnection provisions that enable the interconnection customers to make informed decisions.[133]  Protesters note that MISO failed throughout the stakeholder process to consider this provision, despite stakeholders' repeated requests.[134]

### c.    Answer to Protests of the Filing

80.    MISO disputes requests that a deadline be imposed to require the transmission owners to make the decision to elect Transmission Owner Initial Funding before Decision Point I as outside of the scope of this proceeding.[135]

### d.    Deficiency Letter and Deficiency Response

81.    Staff asked MISO for clarification of two provisions of the proposed *pro forma* FSA:  (1) explanation of the basis for proposing a liability provision that goes beyond the liability provisions in MISO's *pro forma* GIA, FCA, and MPFCA; and (2) clarification regarding an apparent discrepancy in the remedies set forth in Articles X.g and X.b of the *pro forma* FSA.[136]  Finally, staff asked for:  (1) clarification on whether MISO would file an unexecuted FSA with the Commission, if requested by the interconnection customer; and (2) an explanation of why MISO proposes revisions to MISO's *pro forma* GIA to accommodate the proposed *pro forma* FSA but does not propose similar revisions to MISO's *pro forma* FCA and MPFCA.

---

[131] *Id.*; Clean Energy Entities Comments on the Filing at 6.

[132] Clean Energy Entities Comments on the Filing at 6.

[133] *Id.* at 7 (citing Order No. 845, 163 FERC ¶ 61,043 at P 212 ("[T]his [contingent facility] information helps interconnection customers to better assess the business risks associated with contingent facilities and may prevent instances of late-stage withdrawal. We find that these benefits, in turn, lead to a more efficient and informed interconnection process.")).

[134] *Id.* at 7-8; MISO Generation Developers Protest of the Filing at 5-6.

[135] MISO Answer at 13.

[136] Deficiency Letter at 3.

82.   MISO proposes several revisions to the *pro forma* FSA with its Deficiency Response.  First, MISO proposes to revise the *pro forma* FSA and proposed section 17 of the GIP to explicitly provide interconnection customers the ability to request MISO to file the FSA unexecuted.[137]  Second, MISO proposes to revise the liability provision in the *pro forma* FSA to be consistent with the liability provision of the *pro forma* GIA.[138] Third, MISO states that the proposed revisions eliminate the apparent discrepancies in the remedies set forth in Articles X.g and X.b of the *pro forma* FSA.[139]

83.   Finally, MISO explains that it only proposed changes to the *pro forma* GIA, and not the *pro forma* FCA or *pro forma* MPFCA, because a GIA will be in effect for the life of the interconnected generating facility, and the interconnection customer's payment obligation under the FSA commences with the interconnected generating facility being placed in service.[140]  MISO continues that, in contrast, the FCA and MPFCA terminate once the construction of the network upgrade they cover is completed, meaning that they are no longer in effect at the time the interconnected generating facility is placed in service.

### e.   Commission Determination

84.   We find that MISO has responded to protesters' concerns about the interconnection customer's ability to request that MISO file an unexecuted FSA with the Commission by amending its proposed Tariff language in the Deficiency Response to clarify that an interconnection customer may request that MISO file an unexecuted FSA with the Commission.[141]

85.   We find that MISO's proposal in its Deficiency Response to amend the liability provision in section X.g of the *pro forma* FSA, to be consistent with the liability provision in the *pro forma* GIA, adequately addresses protesters' concerns that the provision extends beyond the scope of the *pro forma* GIA, FCA, and MPFCA.[142]  We

---

[137] Deficiency Response at 4.

[138] *Id.* at 6.

[139] *Id.* at 7.

[140] *Id.* at 6.

[141] *See id.* at 7, proposed MISO Tariff, Attach. X, app. 14, preamble (33.0.0).

[142] *See id.* at 6, proposed MISO Tariff, Attach. X, app. 14, art. X.g (33.0.0).

find that these revisions also address any concerns about conflicting remedy provisions in articles X.g and X.b of the *pro forma* FSA.[143]

86.      We deny protesters' requests to make specific changes to MISO's proposal, such as:  (1) mandating that transmission owners must disclose their intent to use Transmission Owner Initial Funding prior to putting cash at risk at or before Decision Point I in the interconnection process; or (2) adding language to ensure that, if the interconnection customer or MISO terminates the GIA before commercial operation is achieved for the generating facility, the FSA likewise will terminate with no liability for any of the payments under the FSA.  We find the first request to be outside the scope of MISO's *pro forma* FSA filing.  In addition, as discussed herein, we find MISO's proposal, which MISO filed pursuant to FPA section 205, to be just and reasonable; we need not find that it is the most just and reasonable proposal among all possible alternatives.

The Commission orders:

        MISO's proposed Tariff provisions are hereby accepted, effective as of the date of this order, as requested, as described in the body of this order.

By the Commission.

( S E A L )

                                            Nathaniel J. Davis, Sr.,
                                            Deputy Secretary.

---

[143] *See id.* at 6.

173 FERC ¶ 61,037
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
Richard Glick and James P. Danly.

Midcontinent Independent System Operator, Inc.              Docket No.   ER20-359-003

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued October 15, 2020)

1.      On November 12, 2019, as amended on November 14, 2019 and January 21, 2020, pursuant to section 205 of the Federal Power Act (FPA)[1] and Part 35 of the Commission's regulations,[2] Midcontinent Independent System Operator, Inc. (MISO) submitted proposed revisions to Attachment X of its Open Access Transmission, Energy and Operating Reserve Markets Tariff (Tariff) to implement a new *pro forma* Facilities Service Agreement (FSA).

2.      In an order dated April 27, 2020, the Commission accepted the proposed Tariff revisions, as requested.[3]

3.      On May 27, 2020, American Wind Energy Association, RWE Renewables Americas, LLC and Savion, LLC (collectively, Rehearing Parties) filed a request for rehearing of the Tariff Order.

4.      Pursuant to *Allegheny Defense Project v. FERC*,[4] the rehearing request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by

---

[1] 16 U.S.C. § 824d.

[2] 18 C.F.R. pt. 35 (2020).

[3] *Midcontinent Indep. Sys. Operator, Inc.*, 171 FERC ¶ 61,075 (2020) (Tariff Order).

[4] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

section 313(a) of the FPA,[5] we are modifying the discussion in the Tariff Order and continue to reach the same result in this proceeding, as discussed below.[6]

## I.   <u>Background</u>

5.      MISO's *pro forma* Generator Interconnection Agreement (GIA) in Attachment X of the Tariff describes the schedule for construction, the details of design, and the payment options for any network upgrades constructed for the interconnection customer by the transmission owner with which it directly interconnects.  In MISO, an interconnection customer is responsible for 100% of network upgrade costs, with a possible 10% reimbursement for network upgrades that are 345 kV and above.  The Tariff provides two options for funding the costs of network upgrades for generator interconnections.  Under the generator funding option, the interconnection customer provides up-front funding for network upgrades and the transmission owner refunds the reimbursable portion[7] of the payment, as applicable, to the interconnection customer in the form of a credit to reduce the transmission service charges incurred by the transmission customer with no further financial obligations on the interconnection customer for the cost of network upgrades (the "Generator Up-Front Funding" option).[8]

6.      Under the transmission owner funding option contained in Article 11.3 of MISO's *pro forma* GIA, the transmission owner can unilaterally elect to provide the up-front funding for the capital cost of the network upgrades and assign the non-reimbursable portion of the costs of the network upgrades directly to the interconnection customer through a network upgrade charge that recovers a return on and of the transmission owner's cost of capital (the "Transmission Owner Initial Funding" option).  The details

---

[5] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[6] *Allegheny Def. Project,* 964 F.3d at 16-17.  The Commission is not changing the outcome of the Tariff Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[7] The reimbursable portion would be 10% of the cost of network upgrades 345 kV and above and zero percent of the cost of network upgrades less than 345 kV.

[8] *E.ON Climate & Renewables North America, LLC v. Midwest Indep. Transmission Sys. Operator, Inc.*, 137 FERC ¶ 61,076, at P 43 (2011) (*E.ON*), *order on reh'g*, 142 FERC ¶ 61,048, at P 39 (2013) (*E.ON Rehearing Order*), *order on reh'g*, 151 FERC ¶ 61,264 (2015).

for repayment of the cost of network upgrades through the network upgrade charge are memorialized in an FSA.  Prior to acceptance of the Tariff revisions in the Tariff Order implementing a *pro forma* FSA, the FSA has been a contract negotiated between the parties and individually filed at the Commission.

7.     In addition to MISO's *pro forma* GIA, the Commission has accepted a *pro forma* Facilities Construction Agreement (FCA) and *pro forma* Multi-Party Facilities Construction Agreement (MPFCA) for use in the MISO region.[9]  The *pro forma* FCA is an agreement for network upgrades on affected systems, i.e., network upgrades constructed for an interconnection customer by a transmission owner other than the transmission owner with which the interconnection customer directly interconnects.  The *pro forma* MPFCA is used when multiple interconnection requests cause the need for construction of common network upgrades (network upgrades that are constructed by a transmission owner for more than one interconnection customer) on a directly-connected transmission system or an affected system.  The *pro forma* FCA and the *pro forma* MPFCA did not originally include the Transmission Owner Initial Funding option that was contained in Article 11.3 of MISO's *pro forma* GIA.

8.     Prior to March 22, 2011, the Tariff contained another funding option, deemed "Option 1" funding, where:  (1) the interconnection customer provided up-front funding for network upgrades; (2) the transmission owner provided a 100% refund of the cost of network upgrades to the interconnection customer upon completion of the network upgrades; and (3) the transmission owner assessed the interconnection customer a monthly network upgrade charge to recover the cost of the non-reimbursable portion of the network upgrade costs.  The terms implementing the refund to the interconnection customer and subsequent recovery by the transmission owner of the Option 1 funding costs are reflected in a FSA.[10]  The Commission found Option 1 funding to be unjust and unreasonable and ordered MISO to remove this funding option from its Tariff.[11]  On rehearing, the Commission clarified that its decision directing MISO to remove Option 1 funding from its Tariff will not apply to large generator interconnection agreements (LGIAs) effective prior to March 22, 2011.[12]  The Commission subsequently issued a number of orders rejecting attempts by transmission owners to impute a security

---

[9] *Midwest Indep. Transmission Sys. Operator, Inc.*, 129 FERC ¶ 61,301, at P 5 (2009).

[10] *Midcontinent Indep. Sys. Operator, Inc*, 154 FERC ¶ 61,072, at P 13 (2016) (*White Oak II*).

[11] *See E.ON*, 137 FERC ¶ 61,076 at P 43; *E.ON Rehearing Order,* 142 FERC ¶ 61,048 at P 39.

[12] E.ON Rehearing Order, 142 FERC ¶ 61,048 at PP 14, 34.

requirement into an FSA implementing Option 1 pricing given that "the [Tariff] does not require or even contemplate the posting of security under an FSA implementing Option 1 pricing."[13]

9.      On June 18, 2015, the Commission granted in part a complaint filed by Otter Tail Power Company, finding that MISO's Tariff was unjust and unreasonable because it did not provide the same network upgrade funding options to all interconnection customers whether in a GIA, FCA, or MPFCA.[14]  The Commission found that the interconnection customers—not the transmission owners—should be allowed to select the financing mechanism; thus, the Commission determined that Article 11.3 of the *pro forma* GIA may be unjust, unreasonable, and unduly discriminatory and directed MISO to make a compliance filing revising its *pro forma* GIA, *pro forma* FCA, and *pro forma* MPFCA to provide that the transmission owner or affected system operator may elect the Transmission Owner Initial Funding option to fund network upgrades only upon mutual agreement with the interconnection customer.[15]

10.     On appeal, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacated and remanded the Commission's orders.[16]  In its order on remand, the Commission reversed its earlier findings and directed MISO to file Tariff sheets that (1) restore the right of the transmission owner to unilaterally elect the Transmission Owner Initial Funding option for the capital cost of the network upgrades under Article 11.3 of the *pro forma* GIA, and (2) allow the affected system operator under the *pro forma* FCA and the affected system operator or transmission owner under the *pro forma* MPFCA to unilaterally elect the Transmission Owner Initial Funding option for the capital cost of network upgrades.[17]  The Commission subsequently denied rehearing of the Ameren Remand Order and accepted MISO's compliance filing restoring Transmission Owner Initial Funding to the *pro forma* GIA and extending Transmission

---

[13] *White Oak II*, 154 FERC ¶ 61,072 at P 13; *Otter Tail Power Co.*, 155 FERC ¶ 61,125, at P 19 (2016) (*Otter Tail*); *see also Midcontinent Indep. Sys. Operator, Inc.*, 152 FERC ¶ 61,145 (2015) (*White Oak I*).  We refer to these orders collectively as the Option 1 Orders.

[14] *Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220, at P 47 (2015).

[15] *Id.* PP 48-49; *Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc.*, 153 FERC ¶ 61,352, at P 65 (2015).

[16] *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 585 (D.C. Cir. 2018) (*Ameren*).

[17] *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158, at PP 33-34 (2018) (Ameren Remand Order).

Owner Initial Funding to the *pro forma* FCA, and MPFCA, effective prospectively as of August 31, 2018.[18]

## II.    Filing

11.    In its November 12, 2019 filing (Filing), MISO explained that the proposed *pro forma* FSA would provide a standard agreement for use when a transmission owner or affected system operator elects Transmission Owner Initial Funding.[19]  Specifically, MISO stated that the *pro forma* FSA would provide for the interconnection customer to compensate the transmission owner for a return on and of the capital the transmission owner has invested through its initial funding of network upgrades that are required for the interconnection customer to receive interconnection service.[20]  MISO also stated that it had proposed revisions to Attachment X of its Tariff and the *pro forma* GIA that were necessary to reflect the addition of, and to effectuate certain provisions of, the proposed *pro forma* FSA.[21]

12.    In the *pro forma* FSA, MISO proposed the following key provisions:  (1) security in the amount of the network upgrade(s) initial capital cost, which may be reduced *pro rata* over the term of the FSA; (2) a monthly network upgrade charge calculated through a formula rate that is based on the FSA's term and the transmission owner's Attachment O formula rate using data from the previous calendar year; (3) a 20-year default term, unless parties mutually agree to a different term; and (4) breach, default, and cross-default provisions with MISO's *pro forma* GIA.

13.    On December 20, 2019, Commission staff issued a letter informing MISO that its filing was deficient and requesting additional information.  MISO submitted its response on January 21, 2020 that included revisions to the Filing (Deficiency Response).  In the Deficiency Response, MISO proposed language to clarify that the security requirement could not lapse between construction and the FSA.  MISO explained that the transmission owner would be required to release security received for each network upgrade's costs

---

[18] *Midcontinent Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,233, at PP 37, 150 (2019) (Ameren Compliance Order).  The Commission also found that "transmission owners and affected system operators should have the unilateral right to elect the Transmission Owner Initial Funding option for any GIA, FCA, or MPFCA that became effective between June 24, 2015 and August 31, 2018 (i.e., during the interim period)." *Id.* P 125.

[19] Filing, Transmittal Letter at 4.

[20] *Id.* at 6.

[21] *Id.* at 4.

under the GIA, FCA, or MPFCA upon the transmission owner's receipt of sufficient replacement security for that network upgrade under the FSA.[22]

## III.    <u>Tariff Order</u>

14.    The Commission found the *pro forma* FSA to be just and reasonable, and not unduly discriminatory or preferential and therefore accepted it.[23]  As relevant here, the Commission found that the proposed security requirement, as revised in the Deficiency Response, was just and reasonable.[24]  The Commission found that the security requirement was a reasonable way to protect the transmission owner and transmission service customers from the risk that an interconnection customer will stop making payments under an FSA, as the unpaid portion of any undepreciated costs would otherwise be borne by either the transmission owner or transmission service customers, or assigned to another interconnection customer.  The Commission found that the requirement was not duplicative of any other financial security.[25]

## IV.    <u>Request for Rehearing</u>

15.    The Rehearing Parties argue that no factual difference exists between the security requirements contained in an FSA that applies Option 1 funding, which the Commission previously found to be unjust and unreasonable, and an FSA that applies Transmission Owner Initial Funding once the network upgrades are complete and operational.[26]  According to the Rehearing Parties, under both FSAs the transmission owner provides the funds to construct the network upgrades and the interconnection customer must pay the transmission owner under the FSA to provide the transmission owner a return of and on its capital investment.  As a result of the similarity between Transmission Owner Initial Funding and Option 1 funding, the Rehearing Parties state that the security requirement under the *pro forma* FSA applying Transmission Owner Initial Funding must be rejected, just as it was rejected under Option 1 funding.[27]

---

[22] Deficiency Response at 4-5.

[23] Tariff Order, 171 FERC ¶ 61,075 at P 16.

[24] *Id.* P 32.

[25] *Id.*

[26] Request for Rehearing at 4.

[27] *Id.* at 4-5.

16.    Similarly, the Rehearing Parties state that, when addressing Option 1 funding in the Option 1 Orders, the Commission rejected the same argument it has now accepted in the Tariff Order – that the security requirement was appropriate to protect the transmission owners from risk of interconnection customers' failure to make payments under the FSA.[28]  The Rehearing Parties acknowledge that the cited precedent did not involve situations where the Tariff in effect at the time included a *pro forma* FSA that contemplated posting security; however, they argue that this distinction does not require different outcomes.[29]

17.    The Rehearing Parties state that, under Commission precedent, post-construction security is not needed because transmission owners are adequately protected by default provisions that make future payments due if payments are missed.[30]  Thus, the Rehearing Parties state that, at minimum, the posting of security should be limited to the period before construction is completed.[31]

18.    Further, the Rehearing Parties suggest that the Tariff provisions require interconnection customers to bear the double burden of simultaneously carrying the long-term liability of payments for the term of the FSA because in the case of "a default, the *pro forma* FSA obligates the interconnection customer to 'promptly pay to Owner all Payments still owed under [the FSA]'", while also being required to post security for that same term in the amount still owed under the FSA.  Cumulatively, the Rehearing Parties suggest this creates a double burden for a single liability.[32]

## V.    Commission Determination

19.    We are not persuaded by the Rehearing Parties' arguments and sustain the result of the Tariff Order, as discussed below.

---

[28] *Id.* at 5 (citing *Otter Tail*, 155 FERC ¶ 61,125 at P 20; *White Oak I*, 152 FERC ¶ 61,145 at P 39; *White Oak II*, 154 FERC ¶ 61,072).

[29] *Id.* at 6-7 (citing Tariff Order, 171 FERC ¶ 61,075 at P 33).

[30] *Id.* at 7-10 (citing *White Oak I*, 152 FERC ¶ 61,145 at P 39; *White Oak II*, 154 FERC ¶ 61,072 at P 14).

[31] *Id.* at 10.

[32] *Id.* at 11 (quoting *pro forma* FSA, Section V.b).

20.    We continue to find that the security requirement, as revised in the Deficiency Response, is just and reasonable.  As noted in the Tariff Order,[33] the posting of financial security is a reasonable way to protect the transmission owner and transmission service customers from the risk that an interconnection customer will stop making payments under an FSA.  The security requirement is there to ensure that no unpaid portion of any undepreciated costs is borne by either the transmission owner or transmission service customers, or assigned to other interconnection customers.

21.    We are not persuaded by the Rehearing Parties' arguments that no difference exists between the security requirements contained in Option 1 funding and Transmission Owner Initial Funding.[34]  Under Option 1 funding, the Tariff required interconnection customers to post security to protect against nonpayment of required milestone payments providing the cost of capital for the network upgrades during construction.[35]  While the duty to provide security ended in the Option 1 Orders when construction ended, there was nothing inherent in the completion of construction that caused the obligation to end. Rather, the security requirements were scheduled to end at that stage under the relevant Tariff provisions,[36] and no Tariff provisions required security after construction was completed.[37]  By contrast, here the security requirements of the *pro forma* FSA continue until the term of the FSA expires, which tracks the remaining balance on the outstanding principal of the network upgrade construction costs that are owed by the interconnection customer.

22.    We are not convinced by the Rehearing Parties' argument that the Tariff security requirements were irrelevant to the Commission's analysis in the Option 1 Orders.[38]  The

---

[33] Tariff Order, 171 FERC ¶ 61,075 at P 32.

[34] Request for Rehearing at 4-5.

[35] *See White Oak I*, 152 FERC ¶ 61,145 at P 39 ("upon completion of the network upgrades White Oak should have made all of its cash payments that were owed to Ameren, which would have reduced White Oak's security requirement under Article 11.5 of the LGIA down to zero dollars"); *Otter Tail*, 155 FERC ¶ 61,125 at P 20 (same).

[36] *See White Oak I*, 152 FERC ¶ 61,145 at P 39.

[37] *White Oak II*, 154 FERC ¶ 61,072 at P 13; *Otter Tail*, 155 FERC ¶ 61,125 at P 19.  While after construction was completed interconnection customers would have other, different, financial obligations including "the cost of capital as well as the non-capital and financing costs," the security required by the Tariff was not intended to cover those post-construction obligations.  *White Oak II*, 154 FERC ¶ 61,072 at P 14.

[38] *See* Request for Rehearing at 6-7.

Option 1 Orders directly rely on the fact that the Tariff only required security until the completion of construction as the basis for the finding that post-construction security was not required.[39] Here, Article 11.3 of the *pro forma* GIA does not address security requirements at all, and MISO is appropriately addressing them in the *pro forma* FSA.

23.     Finally, we are not convinced by the Rehearing Parties' related arguments that: (1) post-construction security is not needed because transmission owners are adequately protected by default provisions in the *pro forma* FSA and that, on this basis, the Commission must reach the same result that it did in the Option 1 Orders;[40] and (2) the security requirement is unreasonable because it creates a double burden for a single liability by requiring an interconnection customer to make payments for the term of the FSA, and to accelerate those payments in the event of a default, while simultaneously carrying the liability of providing security for those payments.[41] We find it reasonable for an FSA to both contain a long-term payment requirement and also require security to cover those payments; indeed, the purpose of security is to provide recourse where a party is unable to pay.[42] Further, the fact that in the event of default an interconnection customer may also be obligated to pay all amounts under the FSA[43] does not make the security requirement unreasonable, given that a default provision alone may not sufficiently protect the transmission owner from the risk of non-recovery.

---

[39] *See White Oak II*, 154 FERC ¶ 61,072 at P 13 (holding "the requirement to post security, like the network upgrade charge, must [ ] be referenced in the Tariff or other agreement even if no *pro forma* version of the FSA exists . . . the [Tariff] does not require or even contemplate the posting of security under an FSA implementing Option 1 pricing"); *Otter Tail*, 155 FERC ¶ 61,125 at P 19 (same).

[40] Request for Rehearing at. at 5-10 (citing *White Oak I*, 152 FERC ¶ 61,145 at P 39; *White Oak II*, 154 FERC ¶ 61,072 at P 14).

[41] *Id.* at 11.

[42] *Cf. Am. Elec. Power Serv. Corp.*, 99 FERC ¶ 61,312, at P 16 (2002) ("The purpose of security is to protect against default and the risk of non-recovery of costs").

[43] *Id.* (citing Filing, proposed MISO Tariff, Attach. X, app. 14, art. V.b (31.0.0)).

Docket No. ER20-359-003                                                          - 10 -

<u>The Commission orders</u>:

     In response to the Rehearing Parties' request for rehearing, the Tariff Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.

( S E A L )

                                      Kimberly D. Bose,
                                         Secretary.